# Richmond.

## The Virginian Railway Company v. James T. Haley.

### March 19, 1931.

Present, Prentis, C. J., and Campbell, Epes, Hudgins and Browning, JJ.

354

The opinion states the case.

*W. H. T. Loyall* and *Hall & Buford,* for the plaintiff in error.

*George E. Allen,* for the defendant in error.

EPES, J., delivered the opinion of the court.

The Virginian Railway Company assigns error to a judgment of the Circuit Court of Brunswick county, rendered on September 17, 1929, in an action brought by James T. Haley against the Virginian Railway Company to recover $50,000.00 as damages for injuries received by him on September 18, 1928, when an automobile in which he was riding was struck by a passenger train at a grade crossing of a public highway and defendant's railroad in the unincorporated village of Dolphin in Brunswick county. We shall refer to the parties as "plaintiff" and "defendant" as they appeared in the trial court.

The notice of motion for judgment alleged various acts of negligence, but at the trial the case narrowed itself down to two questions: (1) Did the defendant fail to give by whistle and bell the crossing warnings required by section 3958 of the Code; and (2) if so, was its negligence in this respect a proximate cause of the injury?

The jury found a verdict for the plaintiff for $6,000.00, upon which verdict the court entered judgment.

The first assignment of error is that the court erred in refusing to sustain the motion of the defendant to set aside the verdict on the ground that the evidence is insufficient to support a verdict in favor of the plaintiff.

The defendant asserts that the evidence is insufficient to support a verdict in favor of the plaintiff for two reasons:

(1) The only evidence that the defendant failed to give the crossing signals is the testimony of certain witnesses that they did not hear the crossing signals given, which is purely negative testimony; while on the other hand a number of witnesses give positive testimony that the statutory signals were duly given; and, therefore, in contemplation of law, there is no evidence that the crossing signals were not given.

(2) Even if the statutory signals were not given, the physical facts and uncontradicted evidence show conclusively that the failure to give the statutory signals was not the proximate cause of the accident.

The plaintiff was a Baptist evangelist who had been assisting Rev. L. J. Adkinson in conducting a revival at a church near Dolphin. On the day of the accident these two ministers had been invited to dine with Mrs. Lizzie Parrish, and were on their way to her home, riding in Mr. Adkinson's automobile, which was being driven by him.

The automobile was a Chevrolet four-door closed car. The window in the left front door was down (open) several inches; and there was a crack in the window in the right front door, that is, it was lowered very slightly. The other

windows were closed. It was raining "just a steady rain," and the wind was blowing from the eastward, though not directly from the east.

Mrs. Parrish's residence is on the south side of the railroad; but it was their intention to go to the postoffice, which is on the north side of the railroad, to get their mail, and then return to Mrs. Parrish's home.

The public highway on which plaintiff was traveling crosses the Virginian Railway tracks at grade 160 feet east of defendant's passenger station at Dolphin. The railroad runs almost due east and west. The highway runs almost due north and south, and is straight for at least 250 feet on each side of the railroad, and apparently continues in practically the same general direction for at least 1,500 feet on the south side of the railroad. The automobile in which plaintiff was riding was going north along this highway.

The accident happened a little after twelve o'clock, noon, on September 18, 1928. The train which struck this automobile was the regular west-bound passenger train of the defendant composed of an engine and three cars, which was scheduled at Dolphin about twelve noon, but was running late. The electric headlight of the engine was illuminated as it approached Dolphin. Mr. Adkinson testifies that he knew the schedule of the train and that it was scheduled to have passed Dolphin before the time at which he was approaching the crossing; but he did not know it was late, and thought that it had passed.

The main line track of the defendant, on which the accident happened, from Dolphin to a point a considerable distance to the east of Dolphin, curves slightly to the north with a curvature of 1° 30′; but one standing on the main line track at this crossing can see a train approaching from the east at any point for approximately one mile. This curvature to the north has the effect of increasing the range of vision along the track of one approaching the crossing from the south.

The obstruction to the view caused by scattered buildings makes looking for a train coming from the east ineffective for a person on the highway approaching the railroad from the south until he is within about 100 feet of the crossing. But from a point 100 feet south of the main line track to the center of the main line track, there is no point at which a person on the highway approaching the crossing from the south cannot see a train at any point on the main line track for a distance of over half a mile east of the crossing, if there is nothing on either of the side tracks to obstruct his view.

Where this highway crosses the railroad there are three tracks, which from south to north are the house side track, the passing side track, and the main line track. The distance from the south rail of the house track to the south rail of the main track is 28 feet. The place at which Mr. Adkinson, who was driving the automobile, testifies he first looked to the east to see if a train was approaching is 18 feet south of the south rail of the house siding, and 46 feet south of the south rail of the main line.

At the time of the accident three coal cars were standing on the house side track east of the crossing. Some of plaintiff's witnesses estimate the distance of the western end of these cars to have been from 66 to 90 feet from the center of the highway. The defendant's witnesses place the western end of these cars 141 feet east of the center line of the highway. The total length of the space occupied by these three cars was 100 feet.

If these cars were located with their western end 66 feet east of the crossing, then from the time a person approaching from the south got within 50 feet of the center of the main line track until he was on the house siding, he could not see a train approaching at any point on the main line east of these cars, unless by looking over the top of the coal cars he could see the top of the engine or the tops of the cars of the train; but looking past the west end of the cars he had an unob-

structed view of the track for a short distance. When within 50 feet of the center of the main line track he had an unobstructed view of the track for only approximately 240 feet east of the crossing. At 36 feet from the center of the main line crossing the span of his view would have been extended to approximately 330 feet east of the crossing. But after getting on the house track (28 feet south of the south rail of the main line track) he had an unobstructed view of a train approaching from the east for about one mile.

When he was 75 feet from the crossing east of the coal cars, one could have seen a train approaching from the east when it was a half mile from the crossing.

The tops of the engine cab and passenger coaches stood a little higher than the tops of the coal cars, and the smoke stack of the engine was yet a little higher. At 75 feet from the crossing a close observer, by looking carefully, could have looked over the tops of the coal cars and seen the smoke stack and the tops of the cab and coaches of a train which was on the main line behind the coal cars; and this may even have been true as to a person anywhere between a point 75 feet from the main line and the house side track. But the further the train was from the coal cars and the nearer the observer was to them the smaller the part of the train which could be seen over the tops of the cars, and when the train was at no great distance from the coal cars any observer, situated as were the people in this car, looking over the coal cars, could have seen no part of it.

Briefly stated, the topography of the country along and adjacent to the defendant's tracks is as follows:

For about 260 feet east of the Dolphin crossing defendant's right-of-way is 200 feet wide. From there on east it is 100 feet wide. The right-of-way is clear of obstructions to vision or hearing along the axis of the right-of-way.

East of the crossing the land along the track is open on the north side of the railroad for 740 feet and on the south

side for 710 feet. This open territory contains the town or village of Dolphin, and there are scattered buildings on both sides of the railroad. The positions of those which are material to the issues here involved will be detailed later.

Plaintiff's witnesses, Mr. and Mrs. C. P. Dawson, Mrs. Parrish, Preston Abernathy and J. M. Sykes, and defendant's witness, R. F. Mann, all of whom testify that they did not hear the whistle blown for the Dolphin crossing, were each at a different point in this open territory at the time the train was where the statute requires the whistles to be blown for the Dolphin crossing.

Just east of this open territory the land adjacent to the right-of-way is wooded on both sides of the railroad. On the north side this wooded area extends from a point 740 feet to a point 2,320 feet east of the Dolphin crossing, and on the south side from a point 710 feet to a point 2,080 feet east of the crossing. East of these woods the country on both sides of the right-of-way is open, Charlie Finch's fields and house being on the north, and J. W. Gilley's fields and house on the south of the railroad.

From a point about 250 feet south of the right-of-way line the highway slopes gently toward the railroad, descending about eight feet in the 250 feet; and then, in the 100 feet from the right-of-way line to main line track, rises approximately one foot to the top of the rails. At a point 150 feet to the north of the tracks, the level of the road is approximately six feet above the top of the rails of the main line track.

There was a "washout" in the roadway 18 feet from the south rail of the house side track (46 feet from the south rail of the main line track). Mr. Adkinson testifies that at this "washout" he first looked to see if a train was approaching the crossing.

For a short distance east of the crossing the tracks are in a cut about seven feet deep; but the depth of this cut falls away to the east until it disappears. At a point 1,960 feet east of the

crossing the tracks enter another cut (depth not given), which extends eastward for a distance which is not shown in the evidence. In the first cut there are three tracks and in the second two tracks.

Defendant's engineer testifies that he blew two long and two short blasts of the whistle for the Dolphin crossing when he was between 1,200 and 1,400 feet east of this crossing, that is, while he was still in the woods but after he passed to the west of the second cut.

Gilley's crossing, a private road crossing, is 3,192 feet east of Dolphin. Charlie Finch's house is situated opposite this crossing, and is 650 feet north of the railroad. Gilley's field is on the south side of the railroad opposite this crossing. The defendant does not claim that the whistle was blown for this private crossing.

The east switch of the passing track is 4,168 feet east of Dolphin. At this point both plaintiff and defendant agree the station signal for Dolphin (one long blast of the whistle) was blown.

Carter's crossing is 312 feet east of the east switch, and defendant's engineer claims to have blown two long and one short blast of the whistle for the crossing. If the signal for Carter's crossing was blown at the minimum distance from the crossing prescribed by statute, these signals were given at least 5,968 feet east of Dolphin.

There was a whistle post on the south side of the track, 3,205 feet east of Dolphin, to warn eastbound trains to blow for Carter's crossing, but the uncontradicted testimony is that there was no whistle post to warn westbound trains to blow for the Dolphin crossing.

Both the engineer and fireman testify that the bell of the engine was rung by an automatic ringer, which was turned on before the train got to the east switch and continued to ring the bell until it was cut off after the accident.

The plaintiff was so seriously injured that even at the time of the trial he was unable to testify.

Mr. Adkinson testifies as follows as to what took place as they approached the railroad and then drove on the main line track:

"I had somewhat let the postoffice slip my memory; it was raining very hard, and Brother Haley and I were talking about going to Mrs. Parrish's for dinner, and things of the church, and when we got to Mrs. Parrish's I put my foot on the release clutch * * * and came near stopping still, and I said: 'We haven't got our mail,' and released it and didn't give it any more gas at all."

After testifying that there was a little washout about eighteen feet south of the south rail of the house siding, he says: "I eased across the place (the washout), and as I eased across it, I looked at the station first to see if there was any train or anything, and I didn't see anything save two coal cars, and I eased up on the track very slow, not expecting anything, probably at seven or eight miles an hour, just as slow as the car would go in high gear, because there were some bad holes on the other side of the track and a dip in the rail. I went on, not seeing any train, and just as my wheel entered between the two 'T' irons, and I didn't see anything, Brother Haley said: 'Look, the train,' and I saw it when it came from behind the coal cars."

"I saw the train, and about the same second Brother Haley said: 'Look, the train,' and I put my foot on the gas, and it was going so slowly it would not pick up, quickly, but I got the car clear of the 'T' iron, and the train struck the rear (of the car) and turned the side of the car into the train."

In other parts of his testimony Mr. Adkinson testifies that he first looked east for a train just before he eased the car down into the washout; that he looked east again as his car pulled out of the washout; that he looked east again just as the front wheels of his car got on the house side track; that at none of these times did he see the train, all that he saw being the coal cars on the side track; and that he did not look

east again until his front wheels were going on the main line track, at which time he saw the train, which was then twenty-five or thirty feet from him, running about twenty miles an hour, but slowing down to come to a stop.

The only testimony of Mr. Adkinson upon the question of whether he listened is as follows:

"Q. Did you listen?

"A. Yes, sir.

"Q. Is your hearing good?

"A. I should think so; yes, sir.

"Q. Did that train blow any crossing signal for that crossing?

"A. No, sir.

"Q. Are you sure of that?

"A. I am so sure of it I believe I would have heard it if it had blown anywhere in reasonable distance. I could have heard the train noise."

Defendant's engineer testifies that he was looking out of the right-hand window of the engine, and did not see the automobile until it came upon the main line track just before the engine struck it; that he had been running about thirty-five miles an hour, but had put on his brakes about 700 or 800 feet from the crossing, and the engine had slowed down to about twelve miles an hour when it struck the automobile.

The fireman testifies that he had gone over to the right side of the engine to get his orders, and did not see the automobile until he returned to the left-hand side of the engine, at which time the engine was about three engine lengths from the automobile which was on the track in front of the engine; and that he "heard" the distress signal sounded, at least one blast of the whistle and perhaps more.

The blowing of the distress signal is therefore fixed as having been blown after the automobile was on the main line track, and almost at the instant the automobile was struck.

Mr. Adkinson was not asked and did not testify as to

whether the bell of the train was ringing or whether he heard the distress signals blown.

In addition to the engineer who testified that he blew the whistle for the Dolphin crossing, eight witnesses introduced by the defendant testified that they heard this train blow for this crossing. Both the engineer and fireman testify that the bell was rung by an automatic ringer which was turned on before the train reached the east switch and continued to ring the bell from there until cut off after the accident. Three other witnesses for the defendant testify that they heard the bell ringing as the train approached the crossing.

On the other hand, several of the plaintiff's witnesses and R. F. Mann, a witness for the defendant, testify that they did not hear the train blow for the Dolphin crossing; and Mrs. Parrish, Mrs. Dawson, and Preston Abernathy, witnesses for the plaintiff, testify that the bell was not ringing, or that they did not hear the bell ringing, as the train approached the crossing. The testimony of these witnesses is the only testimony that the whistle was not blown or bell not rung; and the contention of the defendant is that the testimony of these witnesses on this point is of such a purely negative character as to be no evidence that the whistle was not blown or the bell rung.

Before stating the testimony of the most material of these witnesses, it may be again noted that it was raining steadily and the wind was blowing from the eastward, though not directly from the east; and that each of the plaintiff's witnesses who testified that he or she did not hear the whistle sounded or the bell rung, testified that their hearing was good. The testimony of Mr. Adkinson has been stated and will not be repeated.

The home of Mrs. Parrish, to which the plaintiff and Mr. Adkinson were invited for dinner, is situated 200 feet east of the crossing and 150 feet south of the main line track. The porch extends around the west side and a part of the

north side of the house. One standing at any place on the porch has an unobstructed view of the crossing and the tracks for 200 feet east of the crossing. The kitchen is on the east side of the house in the rear of the dining room, which opens on the north portion of the porch.

Mrs. Parrish testifies that while she was in the kitchen "finishing up the dinner" she "heard distinctly" the train blow one long blast of its whistle, somewhere about Carter's or Gilley's crossing; that she then went into the dining room "stirring around there a bit" putting the last of the dinner on the table, and then went out on the porch; that she had "heard the train" and knew it was about dinner time, and went out to see if her guests were coming; that when she got out on the porch the train had not come into her view; that in a moment she saw Mr. Adkinson's automobile approaching; that they slowed down as they reached the turn into her house, and then drove on toward the railroad; that she followed the car with her eye and saw it drive up on the track and the train hit it; that she estimates that the train was thirty or forty feet from the crossing and was slowing up when she first saw it; that she heard the distress signals, but did not hear the brakes go on, though sometimes she does hear them when applied. On the specific point here in question she testifies as follows on direct examination:

"Q. You say you heard the long blast for the station way down the track; did that train blow any more from that time until it got right at the crossing, when it blew the distress whistle?

"A. No, it didn't blow any more until it blew the short distress signals right at the crossing.

"Q. The train had passed your house before it reached the crossing, as I understand?

"A. Yes, sir.

"Q. Was it ringing the bell when it passed your house?

"A. No, sir; it was not.

"Q. Is your hearing good?

"A. Yes, sir; my hearing is good, and I was standing in position to hear and see, and the wind was coming from that direction."

Perkinson's warehouse is a metal sided building approximately thirty feet wide and sixty feet long, situated 370 feet east of the crossing and fifty feet north of the main line track. Mr. C. P. Dawson was in this warehouse, the large sliding door at the west end of which was about half-way open. He testifies as follows on direct examination:

"Q. Did you hear the danger signal?

"A. Yes, sir.

"Q. Did you hear the brakes applied?

"A. Yes, sir.

"Q. About where was the train when it sounded the danger signal and applied the brakes?

"A. I guess past the house. I was in the house, and didn't see it.

"Q. Did you hear the station blow that day?

"A. Yes, sir.

"Q. What kind of blow was it?

"A. Just one blow.

"Q. Did that train blow any more after it blew the station blow before it blew the danger signal?

"A. I didn't hear it.

"Q. Did you hear it, or not?

"A. I didn't hear it.

"Q. Did you hear the station blow distinctly?

"A. Yes, sir.

On cross-examination Mr. Dawson testifies:

"Q. You heard this station blow?

"A. Yes, sir.

"Q. Where was the train when it blew the station blow?

"A. I don't know. It sounded down the track a pretty good ways. I couldn't tell exactly where.

"Q. Was it down about the Gilley crossing?

"A. I think it was this side of that."

Mr. Dawson was not asked by either party whether he heard the bell ringing.

The Dawson residence is 640 feet east of the crossing and 150 north of the track, and fronts toward the railroad. There is no obstruction between this house and the track. Mrs. C. P. Dawson was standing on the back porch of this house peeling potatoes. On direct examination she testifies:

"Q. Did you hear the distress signals that day from this train just before the accident?

"A. Yes, sir.

"Q. Did you hear the distress signals clearly?

"A. Yes, sir.

"Q. Did you hear the train running on the track before the distress signal sounded?

"A. Yes, sir.

"Q. Did you hear it as it passed your house?

"A. Yes, sir.

"Q. Did you hear the station blow way down the track?

"A. Yes, sir.

"Q. Did that train blow any crossing signal from the time it blew the station blow until it blew the distress signal?

"A. If it did, I didn't hear it.

"Q. Is your hearing good?

"A. Yes sir; fairly good.

"Q. Did you hear the station blow plainly?

"A. Yes, sir.

"Q. That was one long blast.

"A. I heard it blow one time.

"Q. And that was down the track, as I understand you, some little distance?

"A. Yes, sir.

Upon re-direct examination she testifies:

"Q. Was this train in fact either blowing the whistle or ringing the bell when it passed your house?"

Objection. Objection sustained.

"Q. What sound was the train giving out when it passed your house?

"A. It was neither ringing the bell nor blowing the whistle."

Preston Abernathy was in a store on the south side of the railroad. This store faces the railroad, and is situated about 300 feet east of the Dolphin crossing and from 900 to 1,200 feet south of the railroad. There are a few bushes and several houses between it and the railroad, but a train can be seen plainly at intervals for about 900 feet east of the crossing. Abernathy was standing five feet from the front door, which was open, facing a north window, which was closed, and was looking toward the railroad. The train was late and he "was watching for the train to go get the mail." He saw the smoke from the train when it was about a "quarter of a mile" from Dolphin, watched it from the time he first saw the smoke, and saw the train when it got within about 900 feet of the crossing. The store had a rubberoid roof and the rain falling on it made little noise. Abernathy testifies as follows, on the point in question, some of the testimony quoted being given on direct and some on cross-examination:

"Q. Did you hear the noise of the train that day?

"A. Yes, sir.

"Q. Did you hear the train blow for the station that day?

"A. No, sir.

"Q. Well, would you state whether or not the train was blowing its whistle or ringing its bell when it passed the field opposite your store?

"A. I could not hear it.

"Q. Were you listening for it?

"A. I was watching for the train to go get the mail.

"Q. Can you usually hear it blow when it passes by there?

"A. When it blows; yes, sir.

"Q. When did you hear the noise—just as it got opposite you?

"A. Yes, sir. It was going by. There is an opening there, and you can see the train as it passes by and hear it, too.

"Q. Could you hear them put on the brakes for the station?

"A. No, sir.

"Q. You could not hear that?

"A. I did hear the noise about the time it got to the crossing.

"Q. What did you hear then?

"A. The stopping, and then I heard two sharp blasts of the whistle.

"Q. Just as it got to the crossing?

"A. Yes, sir.

"Q. You didn't hear any blow at all until the two sharp blasts?

"A. No, sir.

"Q. Do you know whether the train blew at Gilley's crossing that day?

"A. I didn't hear it.

"Q. If it had blown you would have heard it?

"A. I think so.

"Q. Did it do any blowing after you first saw the smoke and before you heard the danger signals?

"A. No; if it did, I didn't hear it.

"Q. Were you listening for it?

"A. Yes, sir.

"Q. Do you usually hear it along there when it blows?

"A. When it blows.

"Q. Why didn't you hear the station blow at the Gilley crossing?

"A. It must not have blown.

"Q. You were listening for that, too?

"A. Yes, sir.

"Q. And you would have heard it if it had blown?

"A. Yes, sir.

"Q. You don't know where the station blow was blown, do you?

"A. I didn't hear any station blow."

Austin Jones was leaving Charlie Finch's yard (3,192 feet east of Dolphin and about 600 feet north of the railroad), going out to the railroad at a point about 200 to 300 yards west of Gilley's crossing, when he first saw the train; and while he was walking across the field toward the railroad the train passed him. He testifies on direct examination:

"Q. Did you hear the train blow down east of Carter's crossing?

"A. Yes, sir.

"Q. Did you hear it blow the station blow after crossing that?

"A. No, sir.

"Q. Did you hear it do much blowing in there between that crossing and Mr. Gilley's private crossing?

"A. I didn't hear it blow any more until it blew several short blows.

"Q. Distress signals?

"A. Yes, sir.

"Q. Did it blow any more after it left Mr. Gilley's field until you heard the short blasts?

"A. No, sir."

On cross-examination he testifies:

"Q. You heard it blow for the Carter crossing?

"A. Yes, sir.

"Q. You did not hear it blow for the Gilley crossing?

"A. No.

"Q. You didn't hear it blow for the station?

"A. No, sir.

"Q. And you didn't hear it blow any more until you heard the sharp blasts which were given right at Dolphin Crossing?

"A. Yes, sir.

"Q. You were not interested in the train for any reason, were you?

"A. Well, I was close enough and interested enough to know whether it blew or whether it didn't blow.

"Q. Well, of course you were, but you didn't have any special reason to know whether it blew or didn't blow, did you?

"A. Well when any one is near a station or a road they most always notice to see whether a train blows or whether it doesn't.

"Q. They didn't give the station blow the day of the accident?

"A. No, sir.

"Q. The place where it blows for the station is east of the Gilley crossing, isn't it?

"A. It is west.

"Q. And you were two or three hundred yards west of the Gilley crossing in the field, and you didn't hear the station blow?

"A. No, sir.

R. F. Mann, who was section foreman for the defendant at Dolphin was put on the stand by the defendant. He testifies as follows:

"Q. Where were you when this accident occurred in which Mr. Adkinson and Mr. Haley were injured?

"A. Standing right in front of the station.

"Q. Did you hear the station blow?

"A. I heard the station blow. I was in the station; at the time it was raining. I heard the station blow, and it attracted my attention to come out.

"Q. Did you hear any crossing signal after the station blow?

"A. No, sir; I don't think I did.

"Q. You don't remember the crossing blow?

"A. No. I heard the station blow, and it caused me to come out as usually employees do.

"Q. When the train came up did you hear any blows right at the crossing?

"A. I don't remember.

"Q. You don't remember whether you heard any there?

"A. No, sir. The only thing I remember is the bell ringing.

"Q. Was the bell ringing?

"A. Yes, sir; it was ringing when the accident happened.

"Q. And did it continue to ring?

"A. It rang until the fireman went back and cut it off.

"Q. Had the train stopped then?

"A. Yes, sir.

The definitions of and rules relating to negative and positive testimony are well stated in *White* v. *Southern Ry. Co.,* 151 Va. 302, 144 S. E. 424, and *Chesapeake & O. Ry.* v. *Chapman,* 115 Va. 32, 78 S. E. 631, and it is not necessary here to enter upon any general discussion thereof.

The rule applicable to the case at bar, which is fully supported by these cases, is this:

Where a witness testifies that he did not hear a particular sound at a particular time and place, if the evidence shows that he had a good opportunity to hear it, and that the circumstances were such that it is probable that he would have heard it, if it had occurred, or that his attention was in some way drawn to the matter controverted, his testimony is positive, rather than negative, or what may be called *quasi-positive* testimony. In such a case the relative opportunities of the witness who testifies that he did not hear and the witness who testifies that he did hear, the degree of the probability that the former would have seen or heard, if it had occurred, and the intensity with which his attention was drawn to the controverted matter, go to the *weight* of his testimony rather than to the *character* of his testimony.

The testimony of some of the other witnesses for the plaintiff who testify that they did not hear the crossing signal given, is purely negative. But judged by the above standard

the testimony of Mrs. Parrish, Mr. Dawson and Mrs. Dawson, and Mr. Mann that they did not hear the whistle blow for the crossing is positive in its nature. All of them had a good opportunity to hear the whistle if it had been blown for the crossing; the position and the surrounding circumstances of each of them and the things heard by each of them were such that there was a probability, differing in degree perhaps, that he or she would have heard the crossing blow if it had been sounded; and in each case the witness testified to facts which show that to some degree at least his or her attention was in fact attracted to the train and the noises made by it. This is also true of Mrs. Parrish's and Mrs. Dawson's testimony that the bell was not ringing; and to a lesser degree it is true of Mr. Abernathy's testimony that he did not hear the whistle blow or the bell rung for this crossing, and the testimony of Austin Jones that he did not hear the whistle blown for this crossing.

There are in the case of each of these witnesses facts and circumstances which may properly have been considered by the jury as adversely affecting the weight of the testimony as evidence tending to show that the crossing signals were not given. But it cannot be properly said that the testimony of any of these witnesses was so distinctly negative in character as to amount in law to no evidence that the crossing signals were not duly given by whistle and bell.

The evidence presented a proper case for the submission of this question to the jury; and the court did not err in refusing to set aside the verdict on the ground that there was no evidence to support a verdict finding that the defendant failed to give the crossing signals required by law.

We do not wish to be understood to say that this evidence conclusively establishes that the whistle was not blown and the bell not rung for this crossing, or that the clear weight of the testimony is to that effect. The most that we would be understood to say is that this testimony is evidence tending to

establish the fact that the whistle was not blown and the bell not rung; and that such being the case, the settled rule in this State is that the question, whether the whistle was blown and the bell rung, was a question for the jury and not for the court.

Accepting it then as settled by the verdict of the jury, that the defendant failed to sound the whistle and ring the bell as required by the statute, we come now to the defendant's second contention, which is, that the evidence shows that failure to give the crossing signals was not the proximate cause of the accident.

The rule applicable to all actions for the recovery of damages for an act of negligence is that there can be no recovery unless the negligence of the defendant, or that for which the defendant in law must answer, to some degree, or in some way, contributed proximately, and not remotely, to causing the damage for which recovery is sought.

This rule, universally applicable when a recovery is sought for breaches of common law duties, is equally applicable where a recovery is sought for the breach of a statutory duty, unless the statute, expressly or by necessary implication, provides that a recovery may be had where damage occurs coincident with or following the violation of the statute though there be no causal connection between the violation of the statute and the damage which occurred.

"No action can be maintained upon an act of negligence, unless the breach of duty has been the cause of the damage. The fact that the defendant has been guilty of negligence followed by an accident, does not make him liable for the resulting injury, unless that was occasioned by the negligence. The connection of cause and effect must be established. And the defendant's *breach of duty,* not merely his *act,* must be the cause of the plaintiff's damage." 1 Sherman and Redfield on the Law of Neg. (5th ed.) section 25.

"All authorities agree that the plaintiff cannot recover upon

mere proof of his injury. Coincident with the defendant's breach of a statute or ordinance * * *. In such a case, the action would fail for want of connection between the defendant's negligence and the plaintiff's damage. The plaintiff must prove that the breach of regulations was the proximate cause of his damage. That will not be presumed. And, therefore, non-compliance with a statutory requirement, however stringent, affords no ground of action, if compliance therewith would not have prevented the injury." 1 Sherman and Redfield on Law of Neg. (5th ed.), section 27.

Mr. Freeman in his valuable note on "Proximate Cause" in 36 Amer. St. Rep., 807-861, at p. 817, says:

"The general rule is that if a breach of a statute is relied upon by the plaintiff as a cause of action he must show not only that he is one of the class for whose benefit the statute created a duty, * * * but, also, that the breach of the statute is the proximate cause of the injury: * * * 'the question is, was the breach a *causa sine qua non,* a cause which, if it had not existed, the injury would not have taken place.' * * * The doctrine held in some early cases, that a breach of statutory duty was evidence not only of negligence, but also that such negligence caused the injury complained of, is now abandoned."

In 2 Elliott on Railroads (3d ed.), section 842, p. 227 (section 711 of 1st ed.), the author says:

"The rule, supported by the weight of authority, is that while one who violates a statute or an ordinance may be regarded as a wrong-doer, and the act regarded as negligence, still it may or may not be the proximate cause of the injury complained of according to the facts of the particular case. * * * It is generally held, and this we regard as the true doctrine, that the element of proximate cause must be established, and that it will not necessarily be presumed from the fact that an ordinance or statute has been violated. Negligence, no matter in what it consists, cannot create a right of

action unless it is the proximate cause of the injury complained of by the plaintiff."

Again in 3 Elliott on Railroads (3d ed.), section 1648, p. 506, the author says relative to the failure to give the statutory signals at a grade crossing: "In no event is the omission to give the statutory signals sufficient of itself to make out a case, for there must be evidence showing that it was the proximate cause of the injury."

Upon a re-examination of the Virginia cases upon this subject, particularly the cases involving accidents at grade crossings, we are of opinion that the law to be deduced from the Virginia decisions is in accord with the authorities above quoted, and is as below stated.

The failure to give the signals required by section 3958 of the Code within the distances and in the manner prescribed by that section, is negligence *per se,* even though other signals or warnings may have been given, or the signals prescribed by the statute may have been given at a greater or less distance than that prescribed by the Code. *Simons' Adm'r* v. *So. Ry. Co.,* 96 Va. 152, 31 S. E. 7; *Norfolk & W. Ry. Co.* v. *Simmons,* 127 Va. 419, 103 S. E. 609; *Shiveley* v. *N. & W. Ry. Co.,* 125 Va. 384, 385, 388, 99 S. E. 650.

In order, however, to support an action for an injury predicated upon the failure of the railroad company to give the signals prescribed by the statute, the failure to give the signals must have been *a* proximate cause of the injury. That is, the failure to give the signals must have proximately, and not remotely, contributed to some degree or in some way to causing the injury; or to state the same proposition of law negatively, if the failure to give the signals was not a cause contributing proximately to the injury there can be no recovery. *Norfolk Southern Ry. Co.* v. *Banks,* 141 Va. 715, 126 S. E. 662; *Etheridge* v. *Norfolk So. Ry. Co.,* 143 Va. 789, 129 S. E. 680; *Norfolk & W. Ry. Co.* v. *Wellons' Admr.,* 155 Va. 218, 154 S. E. 575. See also, *Gregory* v. *S. A. L. Ry.*

Co., 142 Va. 750, 128 S. E. 272; *Chesapeake & O. Ry. Co.* v. *Meyer,* 150 Va. 656, 143 S. E. 478; *So. Ry. Co.* v. *Johnson,* 151 Va. 345, 146 S. E. 363, modifying opinions reported in 143 S. E. 887; *Chesapeake & O. Ry. Co.* v. *Hewin,* 152 Va. 649, 148 S. E. 794.

■ Prior to the enactment in the Code of 1919 of section 3959, to support an action predicated upon the failure to give the statutory signals it was necessary, (1) that the failure to give the signals should have been a cause contributing to the injury, and (2) that the plaintiff himself should have been free from negligence which contributed to causing the injury. *Atlantic & D. Ry. Co.* v. *Reiger,* 95 Va. 418, 28 S. E. 590; *Simons' Adm'r* v. *So. Ry. Co.,* 96 Va. 152, 31 S. E. 7; *Norfolk & W. Ry. Co.* v. *Simmons,* 127 Va. 419, 103 S. E. 609.

■ Since the enactment of section 3959[1] of the Code of 1919, where the signals required by the statute (section 3958) have not been given, there may be a recovery for any injury to a person crossing the tracks at that crossing, to the causing of which injury the failure to give the signals proximately contributed to any degree or in any way, even though the negligence of the plaintiff, or of some other person, may also have been a cause contributing to the injury; but if the negligence of the plaintiff contributed to causing the injury, it may and must be considered in mitigation of damages. Section 3959 Va. Code; *Norfolk & W. Ry. Co.* v. *Simmons,* 127 Va. 419, 103 S. E. 609; *Norfolk & W. Ry. Co.* v. *Hardy,* 152 Va. 783, 148 S. E. 839.

---

[1]Section 3959.—If the employees in charge of any railroad engine or train fail to give the signals required by law on approaching a grade crossing of a public highway, the fact that a traveler on such highway failed to exercise due care in approaching such crossing shall not bar recovery for an injury to or death of such traveler, nor for an injury to or the destruction of property in his charge, where such injury, death or destruction results from a collision on such crossing between such engine or train and such traveler or the property in his charge, respectively, but the failure of the traveler to exercise such care, may be considered in mitigation of damages.

However, the enactment of section 3959 has not in any degree abrogated or modified the rule of law requiring a causal connection between the failure to give the signals and the injury; has not changed the rules of evidence, or the nature or amount of evidence, required to establish such causal connection; and has not established, or given rise to, any new presumption of causal connection between the failure to give the signals and the injury. Nor does section 3959 provide that the proof of the failure to give the signals and of injury following shall be *prima facie* evidence that the injury was caused by the failure to give the signals. The only effect of section 3959 is to remove the complete bar to recovery which the *contributory* negligence of the plaintiff formerly created, and to give to *contributory* negligence the effect of merely reducing the amount of recovery to which the plaintiff is entitled. *Norfolk & W. Ry. Co.* v. *Simmons,* 127 Va. 419, 427, 103 S. E. 609; *Gregory* v. *S. A. L. Ry. Co.,* 142 Va. 750, 128 S. E. 272; *Etheridge* v. *Norfolk So. Ry. Co.,* 143 Va. 789, 800, 129 S. E. 680.

When the evidence fails to establish that the failure to give the signals contributed to the accident, but shows that the plaintiff's negligence caused or contributed to causing the accident, then, strictly speaking, the evidence proves primary negligence on the part of the plaintiff, rather than contributory negligence on his part. In such a case the primary reason for denying a recovery is that the evidence fails to establish a causal connection between the failure to give the signals and the injury. However, because prior to the enactment of the Code of 1919, even had there been a causal connection between the failure to give the signals and the injury, the plaintiff's negligence would have been a complete bar to an action thereon, the decisions in many such cases ignore the existence of the primary reason for denying a recovery, and base the denial of a recovery on the negligence of the plaintiff.

This has tended to produce some confusion in the use of

these cases as precedents since the enactment of section 3959, and to obscure the cardinal principle, which was true, then, and is equally as true since the enactment of section 3959, that regardless of the negligence or lack of negligence of the plaintiff, there can be no recovery unless there was a causal connection between the failure to give the signals and the injury, and that the establishment of a causal connection between the failure to give the signals and the injury is an essential element of the plaintiff's case.

The establishment of a causal connection between the failure to give the signals and the injury is as essential an element, and as much a part of the plaintiff's case as the establishment of the fact that the defendant failed to give the statutory signals, or that he was injured. All three elements must be established by the evidence. A causal connection between the failure to give the signals and the injury will no more be presumed than that the defendant failed to give the signals or that the plaintiff was injured. Proof of the failure to give the prescribed signals and proof of injury and nothing more are not of themselves sufficient to support a recovery. *Simons' Adm'r* v. *So. Ry. Co.*, 96 Va. 152, 31 S. E. 7, and texts above cited.

Whether the paragraph last above correctly states the law in Virginia has been questioned because of the language used in *Atlantic & D. Ry. Co.* v. *Reiger,* 95 Va. 418, at p. 426, 28 S. E. 590, 593, the language used in the original opinion in *So. Ry. Co.* v. *Johnson,* reported in 143 S. E. 887, the language used in the opinion in *So. Ry. Co.* v. *Johnson,* reported in 151 Va. 345, 146 S. E. 363, as modified upon a rehearing, a portion of the opinion in *Norfolk & W. Ry. Co.* v. *Mace,* 151 Va. 458, at p. 464, 145 S. E. 362, and perhaps by some expressions in other cases.

But upon a re-examination of the question and the Virginia and other authorities, we are of opinion that the law is as above stated, which statement is in accord with the law on this

subject as stated by Keith, P., in *Simons' Adm'r* v. *So. Ry. Co.*, 96 Va. 152, 156, 31 S. E. 7, and the law as applied in *Norfolk So. R. Co.* v. *Banks,* 141 Va. 715, 126 S. E. 662; *Etheridge* v. *Norfolk So. R. Co.,* 143 Va. 799, 129 S. E. 680, and *Norfolk & W. R. Co.* v. *Wellons' Admr.,* 155 Va. 218, 154 S. E. 575.

In *Atlantic & D. Ry. Co.* v. *Reiger, supra,* Buchanan, J., says: "The object of the statute, as stated in its title, was to protect human life; and, as the injury to the plaintiff was especially such a one as the sounding of the whistle was intended to prevent, *some presumption arises that the injury was caused by the neglect, unless the plaintiff's own fault was manifest * *. *.* But such negligence of the defendant does not entitle the plaintiff to recover, unless it was the cause of his injury. Whether it was or was not was to be determined from all the facts and circumstances of the case." The italicized words in the above quotation are misleading.

In the original opinion in *So. Ry. Co.* v. *Johnson,* reported in 143 S. E. 887, 890, but not in the official Virginia Reports, this language is used: "Of course, the burden of proof is upon the plaintiff to prove by a preponderance of the evidence that the statutory signals were not given and that an accident followed. *Once she has proven these, * * * a presumption arises that the injury was caused by the neglect,*" and there is other language in the original opinion to the same general effect as that of the italicized language.

Upon rehearing, the words italicized in the above quotation and the other language relating to the question of a presumption of causal connection was stricken out, the court saying: "The original opinion has been slightly amended without changing the result, by omitting as *obiter dictum* any reference to any legal presumption to be drawn from proof of the injury and the failure to give the statutory signals." We construe this to mean that the italicized language in the above quotation

from the original opinion and language to like effect is disapproved, and expressly adopt that meaning of the language.

Before the rehearing was had in *So. Ry. Co.* v. *Johnson,* the opinion in *Norfolk & W. Ry. Co.* v. *Mace,* 151 Va. 458, 145 S. E. 362, 363, was rendered. In that opinion it was said on the authority of *Atlantic & D. R. Co.* v. *Reiger, supra,* and the original opinion in *So. Ry. Co.* v. *Johnson,* 143 S. E. 887: "Whenever signals of approach are not given at a crossing and there is an accident, a recovery may be had unless it affirmatively appears from the evidence or from the physical facts that there was no causal connection between them."

The language last above quoted goes too far. It is not sufficient to support a recovery that the evidence does not show affirmatively that there was no causal connection between them. The evidence must affirmatively establish that there was a causal connection between the failure to give the signals and the injury which follows in point of time.

When the evidence affirmatively shows that giving the prescribed signals could not, or would not, have prevented the accident, it proves affirmatively that there was no causal relation between the failure to give the signals and the injury. In such cases it is clear there can be no recovery. (See *Norfolk So. Ry. Co.* v. *Banks* and other cases cited herewith above.)

But, as has been said, it is not sufficient to support a recovery that the evidence merely fails to show that the accident could or would have been averted by giving the signals, or that the evidence shows merely a possibility that had the signals been given the accident would not have happened. If it stopped there, the causal connection between the failure to give the signals and the injury would be left merely conjectural; and the burden in these cases, as in all other negligence cases, rests upon the plaintiff to establish the causal connection between the negligence of the defendant and the damage to the plaintiff beyond a mere conjecture. The evidence tending to show causal connection must be sufficient to take

the question out of the realm of mere conjecture, or speculation, and into the realm of legitimate inference, before a question of fact for submission to the jury has been made out.

When, however, the accident is of a nature which the required signals are designed to prevent, if there be evidence tending to establish facts and circumstances from which it may be fairly inferred, or the conclusion fairly reached, that, according to the ordinary experience of mankind, there is a . *reasonable probability* that the accident would not have happened, had the signals been given as required by the statute, such evidence is sufficient to take the question of causal connection out of the realm of conjecture and into the realm of legitimate inference. Whether there is such evidence before the jury is properly a question for the court. If there be such evidence, then the question, whether the failure to give the signals as required was in fact a cause proximately contributing to the injury, becomes a question of fact to be determined by the jury from all the facts and circumstances of the case. *Atlantic & D. R. Co.* v. *Reiger,* 95 Va. 418, 426, 28 S. E. 590; *Simons' Adm'r* v. *So. Ry. Co.,* 96 Va. 152, 156, 31 S. E. 7; *Daniel* v. *Metropolitan Ry. Co.,* L. R. 3 C. P. 216, 222, L. R. 3 C. P. 591, L. R. 5 H. L. 45; *Hayes* v. *Mich. Cent. R. Co.,* 111 U. S. 228, 4 S. Ct. 369, 28 L. Ed. 410; *Philadelphia, etc., R. Co.* v. *Stebbing,* 62 Md. 504; Jones Commentaries on Ev., Vol. 2, p. 927.

The general rule applicable to cases involving the negligence of a railroad company where the person injured is not a passenger, laid down by Willes, J., in *Daniel* v. *Metropolitan Ry. Co.,* L. R. 3 C. P. 216, 222, approved by the court in Exchequer Chamber (L. R. 3 C. P. 591), and by the House of Lords (L. R. 5 H. L. 45) is, that "It is necessary for the plaintiff to establish by evidence circumstances from which it may fairly be inferred that there is reasonable probability that the accident resulted from the want of some precaution which the defendant might and ought to have resorted to."

This rule announced by Willes, J., is quoted verbatim with approval and applied by the Supreme Court of the United States in *Hayes* v. *Mich. Cent. R. Co.*, 111 U. S. 228, 4 S. Ct. 369, 28 L. Ed. 410, a case involving an injury to a child at a place at which an ordinance required the railroad to maintain a fence, and the negligence charged was the failure of the railroad company to comply with the ordinance.

In *Philadelphia, etc., R. Co.* v. *Stebbing,* 62 Md. 504, in a case in which the negligence charged was the violation of a regulation relative to speed in towns and the neglect to give signals of the approach of the train, the court says:

"The principle laid down by an eminent English judge, which was approved by the court in Exchequer Chamber, and by the House of Lords (citing *Daniel* v. *Metropolitan Ry. Co., supra*), is clearly a correct one, and that is, that it is not enough for the plaintiff to show that he has been injured by an accident upon the defendant's road, and thence to argue that the defendant is liable even *prima facie*. It is necessary for the plaintiff to establish by evidence circumstances from which it may fairly be inferred that there is reasonable probability that the accident resulted from the want of some precaution which the defendant might and ought to have resorted to."

The rule laid down by Willes, J., is also adopted, practically verbatim, by Jones in his Commentaries on Evidence (1926) where, in Vol. 2, p. 927, he says in treating of injuries by railroads to persons other than passengers:

"It devolves upon him (the plaintiff) to trace the cause of his injury directly to the fault or neglect of the defendant. To do this he must establish by evidence circumstances from which it may fairly be inferred that there is reasonable probability that the accident resulted from the want of some precaution which the defendant might and should have resorted to; and further, the plaintiff should also show with reasonable

certainty what particular precautions should have been taken to avoid the accident."

The general rule as laid down in these authorities, we think, is the correct rule as to the sufficiency of evidence to establish causal relation; and we know of no principle of law or statutory provision which makes this general rule inapplicable to actions predicated upon the failure of a railroad to give the statutory signals.

Keith, P., in *Simons' Adm'r* v. *So. Ry. Co.*, 96 Va. 152, 156, 31 S. E. 7, 8, a case involving the failure to give the statutory signals for a grade crossing, lays down practically this same rule as applicable to such cases, where he says:

"It is true that proof of the failure on the part of the railway company to give the signal required by statute, and proof of injury to the plaintiff, are not of themselves sufficient to support a verdict against the company. On the other hand, when it is said by courts and text-books that a causal connection must be shown between the breach of duty or act of negligence and the injury, nothing more can be meant than that the evidence must tend to establish such a relation between them, as, according to the ordinary experience of mankind, warrants the conclusion that the injury would not have happened had not the negligence occurred."

A careful analysis will show that in most of, if not in all, the Virginia cases involving a failure to give the statutory signals for a grade crossing in which a recovery has been sustained, either the question of the sufficiency of the evidence to establish causal connection was not raised, or there was evidence which meets the requirements of the sufficiency of evidence rule above stated.

In the instant case the evidence does not show affirmatively that had the prescribed signals been given they would not have prevented the accident. The real question presented by the assignment of error is, was there evidence in the record from which, if it was believed, it could be fairly

inferred, according to the ordinary experience of mankind, that there was a reasonable probability that the accident would not have happened had the signals been given as required by section 3958? We are of opinion that there was.

The maximum at which the speed of the train is placed at any time as it approached within a mile of this crossing is thirty-five miles an hour. The engineer testifies that he applied his brakes from 700 to 800 feet before he reached the crossing, and that the train was running only about twelve miles an hour when it struck the automobile. Taking the speed of the automobile as eight miles, which Mr. Adkinson testifies was the speed of the car as he approached and went on the crossing, at no time while it was traversing the forty-six feet from the washout to the south rail of the main line could the train, if it continued to travel at thirty-five miles an hour, been more than 325 feet from the crossing. If the average speed of the train during this interval was the mean between thirty-five and twelve miles an hour, at no time during this interval could the train have been more than 216 feet from the crossing. When the front wheels of the automobile went upon the house side track (twenty-eight feet from the nearest rail of the main line track), the train could not in any event have been more than 100 feet from the crossing. The train was a light passenger train coming to a stop, and it is improbable that it was making enough noise to drown the sound of its bell, or that the bell could not have been heard for a distance of 300 feet if ringing. At eight miles an hour it is a matter of common knowledge that an automobile can be stopped almost instantly, certainly in much less distance than twenty-eight feet.

Mr. Adkinson, the driver of the car, testifies that he was listening for trains that might be approaching; that his hearing was good; that just before he eased his car down into the washout (forty-six feet from the nearest rail of the main line track) he looked both west and east; that as he pulled out of the washout he looked to the east, and that he looked east

again just as the front wheels of his car got on the house side track (twenty-eight feet from the nearest rail of the main line track). This evidence, if believed, shows that Mr. Adkinson was attentive to the possibility that a train might be approaching from the direction in which this train was coming.

From these facts and circumstances it may be fairly inferred that had the bell been rung or the whistle sounded continuously for 900 feet east of the crossing, as the statute requires, there was a reasonable probability that either he would have heard the bell or whistle and have stopped the automobile in time to avoid the accident, or that Mr. Haley would have heard it and have warned him in time for him to stop the automobile and avoid the accident.

The evidence tending to show a causal connection between the failure of the company to sharply sound the whistle "at least twice at a distance of not less than 300 yards or more than 600 yards" from the crossing is much less satisfactory. The evidence fails to show where the automobile was when the train was from 300 to 600 feet east of the crossing, or what the opportunity of its occupants was to have heard the whistle had it been sounded within those distances from the crossing.

Assuming that the whistle was not blown and the bell was not rung, which the verdict of the jury establishes, there is evidence sufficient to support a verdict predicated upon the existence of a causal connection between the failure to give the signals and the accident.

The third assignment of error is that the court erred in giving plaintiff's instructions numbered A to G. The only grounds of objection to the giving of any of these instructions are "that they are not applicable to the case and that they are without evidence to support them."

These objections are predicated upon the assertions that (1) there is no evidence sufficient to support a verdict finding that the defendant failed to give the statutory crossing signals

and (2) that the physical facts and uncontradicted evidence show conclusively that, even if the statutory signals were not given, the failure to give such signals was not a proximate cause of the injury to the plaintiff.

As has been heretofore said, neither of these positions is tenable; and it is therefore unnecessary to consider this assignment of error further.

■■■ The fourth assignment of error is that the court erred in refusing to give instructions Nos. 9 and 9-A offered by the defendant relating to positive and negative evidence and their respective weights, and in giving in lieu thereof instruction No. XYZ prepared by the court.

Both instructions 9 and 9-A contain the following language:

"When it appears that the witness, or witnesses, who give positive testimony that they heard the signals, would be guilty of perjury unless his or their statements are true; while the witness or witnesses who give negative statements as to the signals may be honestly mistaken, and the witnesses are of equal credibility, the jury should believe the witness or witnesses who give positive testimony as to the sounding of the signals."

The court did not err in refusing to give an instruction with this language in it.

While almost this same language is used in 10 R. C. L., p. 1010-1012, and is quoted in *White* v. *So. Ry. Co.*, 151 Va. 302 at p. 312, 144 S. E. 424, it is used with reference to *purely* negative testimony. It does not correctly state the law unless the testimony of the witnesses who testify that they did not hear a sound, or see a thing, is so purely of a negative character as to constitute, *as a matter of law,* no evidence that the sound did not occur or the thing exist. In this case there was testimony of witnesses that they did not hear the signals given, which is far from being *purely* negative in character; and it would have been clearly erroneous to have given an instruction with this language in it.

Indeed, the giving of such an instruction is not to be approved even where the evidence is purely negative. Wherever such an instruction could be warranted, an instruction is proper which tells the jury that there is no testimony before them which contradicts the witnesses who have testified that the signals were given or were heard by them; and the point should be thus met directly, instead of submitting to the jury the question of whether the witnesses who state that they did not hear the signals can be convicted of perjury if the signals were in fact given.

Instruction XYZ is perhaps not to be in all respects approved, but it was certainly as favorable to the defendant as he was entitled to have it.

The judgment of the court will be affirmed.

*Affirmed.*