# 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉

SOUTHERN RAILWAY COMPANY v. W. L. THOMPSON.

March 3, 1947.

Record No. 3153.

Present, Holt, C. J., and Hudgins, Gregory, Eggleston, Spratley and
Buchanan, JJ.

The opinion states the case.

*Thomas B. Gay* and *A. M. Aiken*, for the plaintiff in error.

*R. Paul Sanford* and *J. William Clement*, for the defendant in error.

BUCHANAN, J., delivered the opinion of the court.

A truck owned and driven by the plaintiff below, W. L. Thompson, on December 24, 1945, in the daytime, was struck by a train of cars that was being backed by the defendant, Southern Railway Company, over a siding across North Main street in the city of Danville. The truck was damaged and the plaintiff was injured. He brought suit against the company, obtained a verdict for $1,250, upon which judgment was entered, and the railway company is here seeking reversal on the ground that the plaintiff was guilty of contributory negligence.

The accident happened at the intersection of State Highway No. 58, running east and west, with North Main street, running north and south. For some distance east of the intersection the railroad siding track ran along a few feet to the north of and parallel to Route 58, crossed North Main street and continued into the plant of Riverside and Dan River Cotton Mills. The exact distance between Route 58 and the siding track at the intersection is not shown in the record. In the argument plaintiff's counsel said the track at

the intersection was about six feet to the plaintiff's right. Defendant's counsel said it was fifteen feet. It was upgrade from the intersection to the siding track and the siding was somewhat higher than Route 58 as they both approached the intersection.

An ordinance of the city of Danville required:

"At the railway crossing of North Main Street and the Southern Railway Company, the railway company shall provide at all times that any engine or car is moving on the tracks of the railway company across the street, a switchman who shall be equipped with a red flag in the daytime and a red light in the night time, and before any engine or car shall approach within twenty-five feet of the outside boundaries of the street, it shall be stopped. Then it shall be the duty of the switchman to place himself within the intersection of the street and the railway tracks and signal all traffic coming along the street to stop, using either his red flag or his red light, and the engine or car, as the case may be, shall not move across the street until such traffic has stopped. After the engine or car shall have passed, it shall be the duty of the switchman to signal traffic to proceed."

On the day of the accident the plaintiff was driving his truck from the east coming west along Route 58. When he came to the intersection of Route 58 with North Main street, a traffic light at the intersection, which was a little to his left, showed red, and he stopped. There was one automobile in front of him which had also stopped for the light. When the light changed to green the car in front pulled out and turned to the left on North Main. The plaintiff turned right, drove upon the crossing and was struck about the right door of his truck by the first of a train of coal cars that was being backed over the siding and across the street toward the cotton mills. This is his account of what happened:

"A. When I drove up there it was on red, and I had to stop. There was one car ahead of me, and when the light come on green, I was about eight yards, I reckon, from the turn. I stopped there, and when the light come on, I

looked carefully. There wasn't no one between me and the train track; no flagman, whatever, or no other man, whatever. I was in second, and I turned right going up North Main Street.

"Q. Did you have a good view of North Main there at the intersection?

"A. I had a good view of North Main, and I turned right up North Main. There was a lot of traffic along there, but there was no one between me. I was looking straight ahead; I wasn't looking to either side. When I drove up and the red light come on, I was still looking right at the red light, and when the green light come on, I turned to the right, and there was no flagman, whatever there.

"Q. And the train hit you?

"A. The train hit me and drove me across the street. I knowed the train had me. I was going across the street, but I didn't know no more after I fell out; I didn't know any more."

There was conflict in the evidence as to whether there was a flagman at the crossing. The plaintiff and some of his witnesses testified none was there. Witnesses for the defendant testified one was there. There was also evidence for the defendant that the plaintiff did not stop at the light, but whipped around the turn at the intersection at twenty or twenty-five miles an hour and onto the track in front of the approaching coal car, and that a pedestrian in the street and the flagman on the crossing had to jump out of the way to keep from being hit. The jury heard the evidence and viewed the scene and their verdict has resolved this conflict in favor of the plaintiff and established that the defendant was guilty of negligence in failing to have a flagman at the crossing and in failing to stop its train and to signal traffic as the ordinance required.

This the defendant does not deny, but it asserts "that the uncontradicted evidence in this record shows conclusively that the plaintiff himself was guilty of such contributory negligence as a matter of law as bars his recovery." The assignments of error to the action of the trial court in

refusing to strike the plaintiff's evidence at the conclusion of all the evidence, in refusing to set aside the verdict and render judgment for defendant, and in granting plaintiff's instructions, all present this issue.

The plaintiff was entirely familiar with this crossing. He had gone along there, he said, for twenty years or more. He knew that the railroad track was just off to his right as he drove along Route 58 into North Main street. The train of cars was backing into the crossing as he made his turn into North Main street. The train was not moving fast, according to the evidence for the plaintiff; about five or six miles an hour, according to the evidence for the defendant. When the collision occurred the coal car that struck the plaintiff was about four feet out into the street. The evidence shows beyond question that when the plaintiff turned from Route 58 into North Main to go across the track, the train was very close to, or already in, the crossing and there was nothing to keep him from seeing it if he had looked.

One of his witnesses was walking down North Main street toward the crossing on the opposite side from the plaintiff. When he first saw the truck it was about three yards from the train, and when he first saw the train "it was out in the intersection—when I saw the train it was just coming out." Another witness for the plaintiff was in a car headed north on North Main waiting for the light to change at the intersection so he could turn right on Route 58. He said he saw the train before the collision, and it was then "moving on up the track out toward the crossing." * * * "I would say around 20 or 25 feet, or steps, whatever you want to call them," * * * "the distance from here to the back of the courtroom, something like that," from the intersection; and further:

"Q. Was it close to the street when you saw it?

"A. It was pretty close.

"Q. And there was nothing to keep anybody from seeing it?

"A. Seeing what?

"Q. Seeing the coal car and the engine?

"A. Well, if a man had been looking, he would have seen it, that is right."

The plaintiff insisted that the train was not there. Of course it was there and all he had to do to find that out was to glance to his right while he waited for the light, or as he turned when the light changed or at any time before he reached the track. He did not see it because he did not look. He said, "I was looking straight ahead. I wasn't looking to either side." "I did not see it before it hit me. I was looking straight ahead."

These are questions and answers from his testimony:

"Q. How did it hit you?

"A. Because I was looking right ahead. The flagman wasn't there. By the time I got to the middle of the track, I reckon the train connected with me, because it hit me in the middle.

"Q. Where do you think the train was when you started to make a turn?

"A. Where do I think it was?

"Q. Yes.

"A. I don't know where it was, because I did not see it.

"Q. It was right there, though, wasn't it? It was bound to have been right there, was it not?

"A. I just did not see it, because I had a clear view.

"Q. You were looking straight ahead?

"A. Right straight ahead.

"Q. How do you know the flagman wasn't there?

"A. I had a clear view, and there was no flagman there, and no train. I imagine, as I started off, the train was coming, and it just connected with me; but, in the meantime, when I started off there was no flagman and there was no train. I did not see it because I was looking straight ahead."

Over and over again he said he did not look, and this answer to a question whether he meant to say the train was not there or that he did not see it, shows very clearly his reason for saying the train was not there, and also presents in clear outline the legal question in the case: "At that time it wasn't there, because the flagman was not there." For him

there was no train because there was no flagman. There was nothing to obstruct his view as he came to the intersection, as he waited for the light, or as he turned and started across. He looked straight ahead, saw no flagman and relied on that alone for his assurance that no train was approaching. The train was there, just a few feet to the right of where he looked for the flagman. The moving train was easier to see than a flagman in the traffic of the city street. If he had looked at all he would have seen for himself what the flagman would have shown him. He did not look or take any precaution for his own safety other than to look straight ahead for a flagman.

The principle has been stated many times that the absence of warning by devices at a crossing does not relieve the traveler of all care.

In *Etheridge* v. *Norfolk So. R. Co.*, 143 Va. 789, 129 S. E. 680, the automatic signals, a ringing gong and waving flag in that case, were not working. The plaintiff had an unobstructed view as he neared the crossing but was twenty yards from the track before he saw the train, too late to keep from running into the tender as it passed. The plaintiff testified that he did not pretend to look for the train because he trusted to the signal. He was held to be guilty of negligence as a matter of law, because "in no possible circumstances could reasonable men differ as to the negligence of this plaintiff;" and " 'if it is clear that only one reasonable inference can be drawn from the facts, and the course which prudence dictates be definitely discerned, the finding thereon is of law, not of fact, and it devolves upon the court to settle the matter.' " (Quoting from *Headley* v. *Denver, etc., R. Co.*, 60 Colo. 500, 154 P. 731).

"If this be not true then never in an accident at a grade crossing whose gong was silent could a demurrer to evidence be interposed—a distance to which no court has gone. It is only necessary that the facts be not in dispute and that the conclusions be inevitable. A further effect of such a rule would be to discourage the use of a safety device, valuable alike to the public and to the railroads." (p. 797).

In *Southern R. Co.* v. *Jones*, 118 Va. 685, 88 S. E. 178, the plaintiff's intestate was riding beside the driver of a horse-drawn wagon and was killed by a train on a crossing in Richmond where gates were required to be lowered, but were up, and there was no watchman and no warning of the approach of the train. The evidence for the plaintiff "conclusively shows that he was relying upon the fact that the gates were up as giving him the unquestioned right of way and as fully justifying him in driving across the track without any precaution whatever for his own safety." In the opinion of the court by Judge Keith, it was held that the duty of the traveler approaching a railroad crossing was to use ordinary care for his own protection. If there was doubt from the evidence on that point, it was a jury question. "But here it appears beyond question that no care whatever was used, reasonable or otherwise, on the part either of the driver or his companion, and under such circumstances there can be no recovery."

In that case the result of former holdings, including *Kimball* v. *Friend*, 95 Va. 125, 27 S. E. 901, in which the question was first dealt with, was stated to be that the presence of gates, gongs or other devices must not be entirely relied on; but that the same degree of care is not required of the traveler as would be if such devices were not in use. In other words, the flagman or mechanical devices are for the safety of the traveler, to warn him of the approach of the train. The use of these warnings affects the degree of care required of him but does not absolve him of all care. They are there to help him find out that a train is coming, but their silence is not a guarantee that one is not coming. If they fail, he cannot go blindly upon the track. He must still exercise care to use his senses and give heed to other existing warnings sufficient of themselves to tell him the train is coming. If the crossing warning is silent and he uses some means to confirm the usual meaning of that silence, and reasonably fair-minded men may differ on whether what he did was ordinary care under all the facts and circumstances, the question of his negligence is for the jury. If he did

nothing but rely on the flagman or warning mechanism, with no reason for not doing more, the question is for the court.

This principle has been consistently adhered to by this court and reaffirmed in recent cases. "Neither gongs nor gates relieve a traveler from the exercise of ordinary care and caution." *Norfolk, etc., R. Co.* v. *Wellons,* 155 Va. 218, 154 S. E. 575. In *Norfolk, etc., R. Co.* v. *Benton,* 160 Va. 633, 169 S. E. 560, it was held that even though a flagman on the crossing signaled the traveler to cross, the traveler was not relieved of the duty of looking. "But in the case at bar, the evidence is that Frazier Benton either did not look toward the approaching train which was in his plain view practically all the time, or if he looked no heed was given to it. Such conduct in either event is contributory negligence as a matter of law." (p. 641). In *Southern R. Co.* v. *Campbell,* 172 Va. 311, 1 S. E. (2d) 255, it is said:

"If a traveler drives blindly upon a crossing whether his view is obstructed or unobstructed, takes no precautions for his own safety and is injured, his negligence will preclude any recovery on his part." (p. 318).

"The fact that a gong is silent and that no watchman is guarding the crossing is merely to be considered in determining whether the traveler has exercised the degree of care required in attempting to negotiate the crossing." (p. 322).

And see *Southern R. Co.* v. *Davis,* 152 Va. 548, 147 S. E. 228; *Southern R. Co.* v. *Whetzel,* 159 Va. 796, 167 S. E. 427.

The plaintiff here used no degree of care in driving upon the crossing. He started across without looking. If he had looked the train was plainly to be seen. He relied upon not seeing the flagman and nothing more.

We hold that under the circumstances shown he was guilty of negligence that bars his recovery. The verdict in his favor should have been set aside and judgment entered for the defendant. The case must, therefore, be reversed and final judgment entered here.

In his brief the plaintiff suggests that the doctrine of comparative negligence is applicable (Code, Secs. 3958-9). That

theory was not advanced in the trial court and was not relied on in oral argument. It is not now to be considered. Burks, Pl. & Pr. (3rd Ed.) Sec. 406, note 25a, p. 768.

*Reversed and final judgment.*