## Staunton

NORFOLK AND WESTERN RAILWAY COMPANY v. EMMETT GRAHAM HAGY.

September 3, 1959.

Record No. 4954.

Present, All the Justices.

The opinion states the case.

*Leonard G. Muse* (*Andrew S. Coxe; Woods, Rogers, Muse & Walker,* on brief), for the plaintiff in error.

*Israel Steingold* (*L. E. Hurt, Jr.,* on brief), for the defendant in error.

EGGLESTON, C. J., delivered the opinion of the court.

Emmett Graham Hagy, sometimes hereinafter referred to as the plaintiff, has recovered a verdict and judgment of $70,000 against the Norfolk and Western Railway Company for damages for personal injuries sustained when a truck which he was driving was struck by an engine and tender operated by the Railway Company at a crossing in the town of Richlands in Tazewell county. In its main assignments of error the Railway Company challenges the sufficiency of the evidence to sustain the verdict, claiming specifically that the plaintiff was guilty of contributory negligence which bars his recovery, and the ruling of the lower court in submitting to the jury whether the operator of the engine had the last clear chance to avoid the collision.

The accident occurred on Saturday, October 23, 1954, at approximately 12:30 p. m., on a clear sunshiny day, when the plaintiff drove his truck northwardly onto the railroad crossing on the single-track main line of the Railway Company between Bluefield, West Virginia, and Norton, Virginia, and was struck by an engine and tender which were backing westwardly along the track. To the east of the crossing, the direction from which the engine and tender came, the track is straight for a distance of 3,000 feet. About 275 feet east of the crossing a spur track leads off from the southern side of the main line and runs southwesterly to an Esso Standard Oil storage plant. Approximately 900 feet east of the crossing two storage tracks, one on each side of the main line, lead eastwardly parallel to the main line. At the time of the collision there were no trains, cars, or engines on the spur or storage tracks.

An unpaved road, running east and west, lies south of and parallel to the main railroad track. It is used by travelers in going to and from the houses fronting on the southern side of the road to the crossing where the accident occurred. As this road goes westwardly toward the crossing it passes over the spur track and forks or divides. One fork, turning southwesterly to the left, leads to the Esso plant; the other fork, turning northwesterly to the right, proceeds in a right-hand arc toward the crossing. From 15 to 25 feet south of the southern rail at the crossing the road straightens out, crosses the track at right angles, and leads to U. S. Highway No. 460. This highway runs parallel to the railroad and at the crossing its southern edge is 50 feet from the northern rail.

Hagy, the plaintiff, was twenty-seven years of age at the time of the accident and had lived at Richlands all of his life. He was in good health, an experienced driver, and employed as a deliveryman by a local florist. He testified that he was familiar with the crossing and for five years preceding the accident had driven over it "practically every day" in making deliveries for his employer and visiting his sister who lived on the road leading to the crossing. Indeed, he said, he had frequently driven over the crossing the identical truck which was involved in the collision. This was a panel truck with a closed body, a front window on each side of the driver's seat, and the usual front windshield.

On this occasion the plaintiff's eleven-year-old niece was seated on his right. They had just left the home of Hagy's sister on the south side of the road. Hagy testified that because the road was rough and unpaved he proceeded westwardly at from five to six miles per hour and crossed the spur track at about the same speed. As he crossed the spur track, he said, from his seat "it was hard to see up the track too far," so he asked his little companion whether she saw "anything." Her reply was, "No, it's one going up." Then, he said, "I proceeded on across" from the spur track toward the main line.

The undisputed evidence is that the distance between the northern rail of the spur track and the southern rail of the main line at the crossing is approximately 65 feet. The road is rough and downgrade for a short distance from the spur track and then up a slight grade to the main track. Because of the rough condition of the road, Hagy said, he continued from the spur track toward the main crossing at about the same speed of five or six miles per hour; that when he was "closer to the main track" he "looked up there and saw the train, the

back of it," and "thought" it was "standing still." He further said, "If it had give me a signal or anything like it always does, I'd have stopped" and "wouldn't have went across." But hearing no signal, he assumed that the way was clear, gave his attention to traffic on the main highway ahead, and proceeded onto the crossing where the collision occurred. According to his testimony he saw the engine and tender but the one time and had no "recollection of ever seeing" them moving.

It is undisputed that as Hagy approached the crossing the engine and tender were not standing, as he thought, and were not "going up," as the little girl had said, but were backing toward the crossing at a speed variously estimated from 25 to 35 miles per hour. The rear of the tender struck the right rear fender and bumper of the truck, throwing the vehicle to the north side of the track. The engine and tender came to a stop about 300 feet west of the crossing. The little girl was killed instantly and Hagy was seriously injured.

Hagy said that he was unable to estimate in feet how far the front of the truck was from the nearest rail at the crossing when he first saw the tender. He said at that time he was "coming up that rise toward the crossing." Nor would he estimate in feet how far the tender was from the crossing when he first saw it. Later, during the trial, he returned to the stand and marked on a photograph the approximate position of the tender when he first saw it. This was estimated at from 212 to 264 feet from the crossing.

Witnesses for the plaintiff testified that the crossing was much used and that trains passing over it customarily blew for it. However, they said, on this occasion no signal was given, and Richard H. O'Dell, the engineer, admitted this to be true.

O'Dell testified that he was seated on the right-hand side of the engine, that is, on the southern side, as it approached the crossing, on a slight downgrade at a speed of from 30 to 35 miles per hour. He first saw the plaintiff's truck as it came off the spur track which is about 65 feet from the crossing. The engine was then about 160 feet from the crossing. He did not blow the whistle, but since the engine and tender appeared to be in plain view of the driver of the truck, he (O'Dell) thought the driver would stop and not attempt to cross ahead of them. However, he said, when the truck was about half way between the spur track and the crossing, the truck "speeded up" and he (O'Dell) realized that "he was not stopping" and applied the emergency brakes. But, as he further said, the engine was

then only about 80 feet from the crossing and it was impossible with the emergency brakes to bring it to a stop before the collision. At the speed at which he was traveling O'Dell estimated that it would have required "several hundred feet" to have stopped the engine with the emergency brakes.

The undisputed evidence on behalf of the Railway Company is that the braking equipment on the engine was in good condition and that with emergency brakes, at a speed of 25 miles per hour it would have required about 400 feet, at a speed of 30 miles per hour it would have required about 500 feet, and at a speed of 35 miles per hour it would have required about 600 feet to have brought the engine to a stop.

Since the crossing is in an incorporated town and there is no evidence of an ordinance requiring the sounding of crossing signals, it is conceded that Code, § 56-414, as amended, imposing the duty of giving crossing signals, and the companion statute, Section 56-416, substituting the doctrine of comparative negligence for that of contributory negligence, are not applicable. Consequently, it must be determined by the application of common-law principles whether the engineer and fireman were negligent in not giving signals of the approaching engine and tender and whether the plaintiff was guilty of contributory negligence.

We hold, and the Railway Company concedes, that because of the nature of the crossing, its frequent use by the public with the knowledge of the Railway Company, and the custom of the operators of the trains to sound signals for the crossing, the jury were warranted in finding that the engineer and fireman were guilty of negligence in not giving adequate and timely warning of the approach of the engine to the crossing. *Norfolk & Western Ry. Co. v. Fletcher*, 198 Va. 397, 401, 94 S. E. 2d 251, 254, and cases there cited.

While some of the circumstances of the present case are unusual, the determination of whether the plaintiff was guilty of contributory negligence turns upon the application of simple and well-settled principles. It is elementary that a traveler on a highway before crossing a railroad track must exercise ordinary care and look effectively for approaching trains. While we have frequently said that whether a traveler has exercised ordinary care at a railroad crossing presents a question for the jury, we have many times held that under the particular circumstances of the case the traveler was guilty of

contributory negligence as a matter of law. Such is the present case.

The principal and basic fact is that the plaintiff, an experienced driver, familiar with this crossing and familiar with the vehicle which he was then operating, drove slowly from a place of safety onto the crossing in front of the engine and tender which, if he ever saw, he did not look at with sufficient care to determine whether they were standing still, coming toward the crossing, or going in the opposite direction.

The evidence clearly shows that as the plaintiff approached the crossing he had ample opportunity to observe that the engine and tender were moving toward the crossing. From the time the plaintiff reached the spur track and began his turn toward the crossing his view of the main track was clear and unobstructed. There were no other cars or trains on the tracks and no other motor vehicles on the road leading to the crossing. Several witnesses for the plaintiff, as well as the engineer for the defendant Railway Company, testified that the engine and tender approached the crossing at from 25 to 35 miles per hour.

Silas L. Vance, a witness for the plaintiff, testified that he was standing on the porch of his residence on the south side of the road leading toward the crossing; that he saw both the engine and the truck approaching the crossing and saw that there "was going to be an accident," because as he said, "the engine was gaining so much on the truck and the truck didn't stop. I was looking to see him hit." And yet according to the testimony of the plaintiff he never saw the engine and tender until he was close to the crossing and even then did not observe that they were approaching.

If it be true, as the plaintiff says, that as he left the spur track and approached the main crossing it was difficult for him to see to the right, the direction from which the engine and tender came, through the right front window of the truck, this was a condition which was well known to him since he had driven the same vehicle along the road and over this crossing many times. He was, then, required to use increased care commensurate with the conditions.

It is well settled that the fact that one is traveling in a covered or enclosed vehicle which interferes with his sight does not excuse him from looking or listening for approaching trains at a railroad crossing, but calls on him to use increased care commensurate with the situation. This is especially true where the traveler in such vehicle is familiar with the crossing. 75 C. J. S., Railroads, § 789, p. 59; 44 Am. Jur.,

Railroads, § 555, p. 808; *Nashville, Chattanooga & St. Louis Ry. Co.* v. *Stagner*, 305 Ky. 717, 205 S. W. 2d 493, 494.

In this connection it is significant to observe that in his original motion for judgment the plaintiff alleged "that he relied on his passenger in telling him that the track was clear." While in his amended motion he changed this allegation to read, that he "relied on his passenger to assist him in keeping a proper lookout for trains," it is apparent that his own testimony is in accord with his first allegation.

But this is not all. The plaintiff testified that as he neared the crossing he actually saw the engine and tender which he "thought" were standing still. According to his own testimony, the truck was in good condition and he was proceeding in second gear at from five to six miles per hour. It is a matter of common knowledge that at this speed the truck could have been stopped almost instantly. Indeed, the plaintiff testified that he "could almost stop immediately coming up the hill onto the track," and would have done so had he known that the engine and tender were approaching the crossing. To use his own words, "If it had give me a signal, I would have stopped." However, he did not stop or diminish his speed, but proceeded across the track without observing that the engine and tender were approaching.

The gist of the plaintiff's case is that the failure of the employees of the Railway Company to give the customary signal was an invitation for him to cross the track and the assurance that he could do so with safety. Assuming, but not deciding, that the failure to give the signal was an invitation to the plaintiff to cross the track, this did not relieve him of the duty of exercising ordinary care and looking effectively before going onto the track. Nor can the plaintiff relieve himself of this duty by saying, as he does in his brief, that his "failure to look effectively was brought on by the company's negligence." In effect, this is an invocation of the doctrine of comparative negligence which, as has been said, has no application here. The plaintiff here cannot excuse his contributory negligence by invoking and magnifying the negligence of the defendant Railway Company.

We have repeatedly held that the failure of a railway company to give the required signals does not relieve a traveler at a railroad crossing of all care. He must still exercise ordinary care to use his senses to observe whether a train is approaching. See *Southern Railway Co.* v. *Thompson*, 186 Va. 106, 41 S. E. 2d 456, and cases there collected.

In that case the plaintiff drove onto a crossing in the city of Danville where his truck was struck by a slowly backing train. He assumed that because there was no flagman at the crossing, as required by a city ordinance, no train was approaching. Consequently, he never saw the train which struck his vehicle. In reversing a judgment for the plaintiff we held that he was guilty of contributory negligence as a matter of law in that he relied entirely upon the absence of the flagman as an invitation to cross the track and failed to see the oncoming train.

In *Norfolk & Western Ry. Co.* v. *Benton*, 160 Va. 633, 169 S. E. 560, a driver of an automobile was struck and killed at a crossing in the city of Hopewell. A flagman at the crossing signaled the train to stop and waved the driver of the automobile to cross. Relying upon this invitation, the decedent drove across the track without observing that the train had not stopped but was approaching. In reversing a judgment for the decedent's administratrix and entering final judgment for the defendant, we held that the decedent was guilty of contributory negligence as a matter of law in that he relied "solely and exclusively" upon the invitation of the flagman to cross the track without looking for the approaching train which was in plain view.

This is precisely what Hagy did. According to his own testimony, although he saw the engine and tender, he relied entirely upon the lack of a signal as an invitation to cross the track and drove onto the crossing without observing whether the near-by engine and tender were standing still, moving toward the crossing, or going in the opposite direction. Surely, such casual and perfunctory looking was not looking effectively or with reasonable care. It was tantamount to not looking at all and likely to produce the same result.

In his brief counsel for Hagy admits that the *Benton* case stands in his way and asserts that it is "contrary to the great weight of authority" and shall be "disavowed" by us. We decline that invitation for the reason that that decision is based on sound reasoning and the application of elementary principles. It was expressly approved by us in *Southern Railway Co.* v. *Thompson, supra*, 186 Va., at page 114, 41 S. E. 2d, at page 460.

As the underlying principle was stated by Judge Dobie in *New York Central R. Co.* v. *Casto*, 4th Cir., 216 F. 2d 604, 606, the duty of a car operator approaching a railroad crossing "to look for ap-

proaching trains and to look effectively" "is not tempered by the failure of a railroad company to observe all safety requirements."

For these reasons we hold that the plaintiff was guilty of contributory negligence as a matter of law. Therefore, his case must fail unless it may be saved by the application of the doctrine of last clear chance.

■ In *Greear* v. *Noland Company*, 197 Va. 233, 238, 239, 89 S. E. 2d 49, 53, we pointed out that the doctrine of last clear chance applies, "[1] Where the injured person has negligently placed himself in a situation of peril from which he is physically unable to remove himself, the defendant is liable if he saw, or should have seen, him in time to avert the accident by using reasonable care. [2] Where the plaintiff has negligently placed himself in a situation of peril from which he is physically able to remove himself, but is unconscious of his peril, the defendant is liable only if he saw the plaintiff and realized, or ought to have realized, his peril in time to avert the accident by using reasonable care."

Under these stated principles the doctrine of last clear chance is not applicable in the present case. If the facts and circumstances bring the plaintiff's case within the doctrine, it must be within the second class as defined in the *Greear* case; that is, the plaintiff negligently placed himself in a situation of peril from which he was physically able to remove himself, but was unconscious of his peril, and the engineer saw the plaintiff and realized, or ought to have realized, his peril in time to avert the accident by using reasonable care.

But the facts and circumstances here do not place the plaintiff in that class. There is no showing that the engineer had the last clear chance to avoid the collision after he realized, or ought to have realized, the peril of the plaintiff. As the engineer saw the plaintiff driving at a slow speed from the spur track toward the crossing, there was nothing to put him on notice that the plaintiff was unconscious of his peril until the plaintiff was within a few feet of the crossing. Then, as the engineer testified, the plaintiff speeded up his truck, which indicated that he intended to cross the track. Prior to that time, at the speed at which the plaintiff was proceeding, he could have stopped in ample time before reaching the track. Since the engine and tender were in plain view, the engineer had the right to assume that the plaintiff would stop. When the engineer first realized that the plaintiff would not stop, the tender was then only about 80 feet from the crossing. The undisputed evidence is that the engineer

did not then have sufficient time and space to stop the engine before the collision. The last clear chance doctrine presupposes time for effective action and is not applicable when the time is too short for the defendant to avoid the accident by exercising reasonable care.

For these reasons the judgment is reversed, the verdict set aside, and a final judgment here entered for the defendant.

*Reversed and final judgment.*