## Wythebille

RUBY PEARL JOHNSON, AN INFANT, ETC. V. RICHMOND, FREDERICKSBURG AND POTOMAC RAILROAD COMPANY, ETC.

June 15, 1933.

Present, All the Justices.

The opinion states the case.

*M. J. Fulton, P. A. L. Smith, Jr.,* and *Holmes Hall,* for the plaintiff in error.

*E. Randolph Williams* and *Edmund M. Preston,* for the defendant in error.

BROWNING, J., delivered the opinion of the court.

This was an action for damages to the infant plaintiff for injuries sustained in a collision between the automobile in which plaintiff was riding and the train of the defendant in the town of Ashland, Virginia. The court set aside the verdict of the jury, which was for the plaintiff in the sum of $1,500.00, and dismissed the action at the plaintiff's costs. The facts are clearly stated by the court in its opinion, made a part of the record, and we quote them in full:

"This was an action brought in this court by the plaintiff to recover damages for personal injuries alleged to have been sustained by the negligence of the defendant. The case

was tried on June 11, 1931, resulting in a verdict for the plaintiff in the amount of $1,500.00. The defendant by counsel moved that the verdict of the jury be set aside and that judgment be entered for the defendant on the grounds that the verdict is contrary to the law and the evidence, and contrary to the instructions of the court; that the court erred in giving certain instructions objected to by the defendant, and in failing to give certain instructions asked by the defendant; that the verdict is without evidence to support it; for misdirection by an error of the court in including certain testimony objected to by the defendant and excluding certain other testimony sought to be introduced by the defendant; and because the verdict records a plain deviation from right and justice.

"The salient facts in this case are these: On August 31st, at 4:22 A. M., the automobile in which the plaintiff was riding was in collision with a train of the defendant in the town of Ashland, Virginia, at the point where the Charlottesville highway crosses the main line of the defendant. As a result of this collision the plaintiff suffered injuries consisting of lacerations to the head and a broken leg.

"Lonzi Johnson, the father of and chief witness for the plaintiff, testified that he and his wife, his two-year-old son and his seven *month* old daughter (the plaintiff) were invited by one, Richard Morris, to go to Waynesboro with him in a car belonging to Morris and his sister. Pursuant to the invitation Johnson, his wife and two children, one Harvey Glass and Richard Morris started from Richmond at 3:45 A. M., on the morning of August 31, 1930, en route to Waynesboro *via* the Richmond-Washington highway from Richmond to Ashland and thence over the Charlottesville highway through Ashland.

"At the time of the accident Morris occupied the driver's seat on the left side of the front seat, with Harvey Glass on his right. Johnson occupied the right corner of the rear seat. Next to him was his son, and in the left corner of the rear seat was his wife with her daughter on her lap. The

car in which they were riding was a Chevrolet six cylinder coach.

"Johnson testified that in driving from Richmond to the place of the accident the car was at no time driven at a speed exceeding twenty-five or thirty miles an hour. He says the accident occurred as follows:

" 'Q. When you got to Ashland what did you do?

" 'A. When we got to Ashland we turned out on thirty-nine road, and when we got to this crossing he threw his hand down, like that (indicates) in case any one was behind him; when we got to the east curbing we came almost to a stop, and looked up the track south towards Richmond; we saw nothing and heard nothing; then he "seized" the car a little bit to get across, and then looked up north to see if there was anything on the west track, and we didn't see anything, and when we looked again this train was about I think fifty feet ahead of us.

" 'Q. You mean to the south of you?

" 'A. Yes.

" 'Q. That is, from the crossing?

" 'A. Yes, sir. And then Mr. Morris tried to cut away from the train, and that is when the train hooked us.

" 'Q. At the time that you got up to the track and looked south, where was the front end with reference to the east rail of that track on which the train was—where was the front end of the engine?

" 'A. You mean the engine of the automobile?

" 'Q. Yes, how close up to the rail was it?

" 'A. I reckon a foot or two.

" 'Q. At what speed do you think the automobile was going at that time?

" 'A. Five or six miles an hour.

" 'Q. You stated when you came up to the east side of the street, you slowed down?

" 'A. Yes, sir, he came almost to a stop.

" 'Q. Can you give the jury any idea what the speed was he slowed down to at that time?

" 'A.   I reckon to two or three miles; he came to almost a
stop.

" 'Q.   Was that the time you both looked?

" 'A.   Yes, sir, absolutely.

" 'Q.   When he saw the train coming about fifty feet
away, and his engine was within a foot of the east rail, you
were going five or six miles an hour?

" 'A.   Yes, sir.

" 'Q.   What did the driver do then?

" 'A.   He tried to get down the track—he pulled to the
right.

" 'Q.   When you looked—when the automobile was going
about two miles an hour—about how far south did your
vision extend?

" 'A.   About four hundred and fifty feet.'

"He further testified that the engineer gave no signals
of the approach of the train, but on cross-examination ad-
mitted that all he could say was that he heard no bell or
other signal.

"The testimony shows that before reaching a point op-
posite the east curb of the sidewalk, which was approx-
imately fifty-five feet from the east rail of the northbound
track of the defendant, none of the occupants of the car
looked or listened for the approach of the train.   After
coming nearly to a stop at that point the occupants of the
car looked north until the car was within one foot of the
east rail of the northbound track and failed to look south
again until too late to avoid the accident.   At this point the
driver of the car made an effort to turn the car in the direc-
tion in which the train was coming, and as he did so the
collision occurred.   The headlight of the engine was burn-
ing.   At the place where the automobile nearly stopped and
its occupants looked south for the first and only time until
immediately prior to the accident, the view of the south-
bound track extended 450 feet south along the track from
the crossing.   The railroad track south of the crossing was
straight and level for an indefinite distance—as far as the

eye could see. A point in the highway from the corner of the first building on the south of the highway projected to the center of the highway to the east rail of the northbound track, is sixty-two feet. The line of vision from this point looking south on the northbound track extends for 190 feet south of the crossing. From a point in the center of England street (the Charlottesville highway) fifty-eight feet east of the east rail of the northbound track the line of vision extends southwardly along the northbound track to a point 494 feet south of the crossing. At a point in the highway forty-eight feet from the east rail of the northbound track the line of vision south measured along the track is 700 feet. At a point thirty-nine or forty feet from the east rail of the northbound track the line of vision south of the crossing along the northbound track becomes indefinite. One can see as far as the eye can reach.

"Johnson stated that he could not estimate the speed of the train, but F. P. Moroney stated that the speed of the train was between forty and forty-five miles an hour. This statement is based upon the sole fact that when the train stopped he was thrown forward in his seat. He observed nothing in regard to the movement of the train or the surrounding conditions until the train actually stopped. Moroney did not know where the car in which he was riding was placed in the train. He testified he did not hear the bell ring.

"After the collision occurred the automobile was carried in front of the pilot of the engine along the track for a distance of 233 feet, at which point the train stopped. The testimony showed that the shortest distance within which a train traveling from eighteen to twenty miles an hour with its brakes in good condition and applied in emergency could be stopped was 200 feet. This was testified to by C. Gibson Saunders, engineman. At the time of the accident it was dark but clear.

"There were only two eyewitnesses to the accident who testified in this case, the first, Lonzi Johnson, and the second

C. Gibson Saunders, the defendant's engineman. Saunders had been a locomotive engineer in the employment of the defendant for a period of twenty-seven years. He had been operating passenger trains between Richmond and Washington for a period of about five years. On the day of the accident his train left Richmond at four o'clock. The regular running time to Ashland was twenty-one minutes. On the morning of the accident it took him twenty-two or twenty-three minutes to make the run. He said that on approaching the Ashland station about 4:22 in the morning, when the front of his engine was about twenty-five feet from the crossing he saw an automobile come from behind the bank building on the south of the Charlottesville highway and east of the crossing, running at a speed of about forty miles an hour. He saw immediately that the automobile was not going to stop at the crossing and he instantly applied his brake in emergency. As he did so the accident happened. The speed of the train was between eighteen and twenty miles an hour, and the headlight, which was in first class condition, was burning brightly and had been burning from the time the train left Richmond. At the time of the accident the engine bell was ringing and had been ringing from the time the train arrived at Ashland. His testimony is corroborated by the fireman, D. L. Mills.

"The foregoing is the principal testimony in this case. In the cross-examination of Johnson he denied making certain statements at the time of·the accident and in this was contradicted by Shepherd and others."

The plaintiff alleged negligence upon the part of the defendant in the following particulars:

That it was, at the time of the accident, operating its train at an unlawful rate of speed; that it was not, at the time, keeping a proper lookout for the plaintiff and others who might be approaching said street crossing; that it did not keep the bell of its engine constantly ringing, while it was passing through the town of Ashland and over the railroad crossing; that in the matter of the speed of its train

and the ringing of the bell it violated the provisions of a town ordinance which prohibited a greater rate of speed than twenty miles an hour and required the locomotive bell to be kept constantly ringing.

It is of course elementary that it was incumbent upon the plaintiff to prove the alleged acts of negligence and that such negligence, when proved, was the proximate cause of the injury.

The only direct testimony of the excessive speed of the defendant's train is to be found in the statement of the plaintiff's witness, F. P. Moroney. He testified that it was his judgment that the speed of the train, at the time of the collision, was between forty and forty-five miles an hour; that he based this estimate on the suddenness of the stop which caused him to be thrown forward against the seat in front of him. This witness was a passenger riding on the train in the seventh car from the coal tender; he was reading a paper from the time of leaving Richmond to the moment of the accident; he was not aware of the fact that he or the train were in Ashland, he said that the collision occurred between half past six and seven o'clock in the morning. As a matter of fact it happened about 4:22 A. M.

Opposed to this mere estimate of a preoccupied and inattentive witness is the positive testimony of the defendant's engineer that the speed of his train was between eighteen and twenty miles an hour and that of the fireman, who was, at the time, seated on the left seat box of the engine, that in his estimation the train was running from fifteen to eighteen miles an hour.

The defendant's counsel aptly characterized the evidence of Moroney as being "an inference based upon a presumption." In the case of *C. & O. Ry. Co.* v. *Heath*, 103 Va. 64, 48 S. E. 508, it was said: "An inference cannot be drawn from a presumption, but must be founded upon some fact legally established * * *. When liability depends upon carelessness or fault of a person, or his agents, the right of

recovery depends upon the same being shown by competent evidence, and it is incumbent upon such a plaintiff to furnish evidence to show how and why the accident occurred—some fact or facts by which it can be determined by the jury and not be left entirely to conjecture, guess or random judgment, upon mere supposition without a single known fact."

As the scintilla doctrine does not now obtain in Virginia the unsupported estimate of the witness, Moroney, as to the matter of speed, viewed in the light of the attendant circumstances, falls far short of the dignity of proof.

The undisputed evidence was that the train was stopped at a point 233 feet from that of the collision and that a train composed of an engine, tender and eleven cars, running eighteen to twenty miles an hour, with the brakes in proper condition and applied in emergency could not be stopped in a shorter distance than at least 200 feet. This is an important physical fact demonstrative of the speed of the train which is in harmony with the contention of the defendant and which we think is highly probative.

With respect to the question as to whether the locomotive bell was rung in accordance with the provisions of the town ordinance, at the time of the accident, the testimony which the plaintiff adduced to prove that it was not so sounded was that of Mr. Johnson, father of the plaintiff, who was seated in the rear right hand seat of the automobile, who said on examination in chief that no signals were given and the bell was not ringing, but on cross-examination he testified as follows:

"Q. And you say that the bell was not ringing?

"A. It was not ringing, or we would not have started across there.

"Q. What called your attention to the bell?

"A. We were listening for it; we knew there was a crossing there.

"Q. Have you ever stood at a crossing and seen the bell ringing and yet not heard it?

"A.  I sure have.
"Q.  So all you can say is that you heard no bell?
"A.  Heard no bell and no signals whatever."

And the testimony of the witness, Moroney, who said that he did not hear the bell ring but that prior to the time of the sudden stop he was not paying any special attention to whether the bell was ringing or not.

On the part of the defendant the engineer testified that the bell was ringing and had been from the time of entering Ashland and the fireman testified that he was looking out the front window and ringing the bell.

Here we have evidence negative in character opposed by positive testimony.  It will be noted that Johnson was on the rear seat on the right side of the automobile which was further from the crossing and from the engine than any other part of the vehicle and that the engine of the automobile was running all the while.  Also that he and the other occupants of the automobile looked south when they were fifty-five feet from the crossing and after that they were looking north in apprehension of a train coming from that direction and, of course, their attention, to some extent, was directed to that conduct.

In the case of *White* v. *Southern Ry. Co.*, 151 Va. 302, 144 S. E. 424, 426, this court quoted, with approval, from 10 R. C. L., 1010 to 1012, where it was said:  "Wherever it can be perceived that a positive witness is guilty of perjury unless his statement is true, while a negative witness may be honestly mistaken, the issue should be found in favor of the former if the witnesses are of equal credibility  Negative testimony proper is entitled to no weight."

And quoting again from the same author this was said:  "So, it is held that as against positive affirmative evidence, by credible witnesses, that warning of the approach of a railroad train to a highway crossing was given by the ringing of the bell or the blowing of the whistle, there must be something more than the testimony of witnesses who, by reason of their surroundings, would be un-

likely to notice the giving of such warning, that they heard neither a bell rung nor a whistle blown, in order to justify the submission to the jury of the question whether such warning was given. Negative testimony proper acquires no weight by reason of the number of witnesses who give it."

For an excellent exposition of what is positive and negative testimony and the effect of the same see the case of *Virginian Ry. Co.* v. *Haley,* 156 Va. 350, 157 S. E. 776, opinion by Justice Epes.

It follows that in our opinion the verdict of the jury was contrary to the evidence, without evidence to support it and a plain deviation from right and justice.

We are very mindful of the respect that is due to the verdict of the jury, and that respect we must ordinarily heed, but it is not obligatory upon us, "when to do so would strain the credulity of the court, and require the entry of a judgment contradicted by every other fact and circumstance of the case." *Meade* v. *Saunders,* 151 Va. 636, 641, 144 S. E. 711, 712; *Vandenbergh & Hitch, Inc.* v. *Buckingham Apartment Corp.,* 142 Va. 397, 128 S. E. 561.

In the case of *N. & W. Ry. Co.* v. *Wellons' Adm'r,* 155 Va. 218, 154 S. E. 575, 579, this court said, Justice Holt delivering the opinion: "It is said that all of these matters are for the jury, and that our court has frequently so held. All of this is true, but in all cases of this character there was something for the jury to decide, some issue made by the evidence. It is our duty to support a verdict when possible, while it, in turn, must be supported by the evidence. Any other rule would make of it a fetish and put away that responsibility which must always rest upon the court."

It was said in the case of *Ricketts* v. *J. G. McCrory Co.,* 138 Va. 548, 559, 121 S. E. 916, 920: "A verdict which has been disapproved by the trial judge is not entitled to the same weight on appeal as one that has been approved by him." See, also, *DuPont, etc., Co.* v. *Taylor,* 124 Va. 766, 98 S. E. 866; *Cardwell* v. *N. & W. Ry. Co.,* 114 Va. 500, 506, 77 S. E. 612, 614.

As to the allegation that the defendant did not keep a proper lookout we think that there is no evidence to support this contention but that it is quite to the contrary.

However, if the negligence of the defendant, in the particulars mentioned, were conceded, we would still have before us a case in which the plaintiff's witness, Johnson, the only eyewitness to the accident, save the defendant's engineer, admitted that at a point from which he could see south down the defendant's track 450 feet, he looked in that direction and saw nothing; that subsequently as the automobile approached the crossing, he and the other occupants looked to the north until they were about one foot from the east rail of the defendant's track and they neither heard nor saw anything connected with the train.

It is inconceivable that this could be so when the rays of the headlight of the engine must have been projected along the track, on the crossing and against the passenger station a few feet to the north and all stationary objects between with an effulgence which could not be hidden. The testimony is incredible. It is opposed to human experience.

The case is so similar in nearly all of its aspects, to that of *C. & O. Ry. Co.* v. *Barlow*, 155 Va. 863, 156 S. E. 397, 399, in which Justice Hudgins delivered the opinion, that we think the latter is controlling.

There it is said: "This court has repeatedly declared that courts are not required to believe that which is contrary to human experience and the laws of nature, or which they judicially know to be incredible. Though the case be heard as upon a demurrer to the evidence, the court will not stultify itself by allowing a verdict to stand, although there may be evidence tending to support it, when the physical facts demonstrate such evidence to be untrue, and the verdict to be unjust and unsupported in law and in fact." See cases cited.

In the *Barlow Case, supra*, it was further said: "This court has consistently construed section 3959, Code, to mean that there must be a causal connection between the

failure to give the statutory signals and the injury, but in no case has a recovery been allowed where the undisputed evidence showed that the plaintiff's negligence was the *sole* proximate cause of the collision. If the plaintiff sees that the train is approaching, the blowing of the whistle and the ringing of the bell can give him no further information, and if he attempts to cross the track and is injured the accident is the result of his own negligence, and the negligence of the company in failing to give the statutory signals cannot be said to be a contributing cause of his injury." See, also, *Wilmouth's Adm'r* v. *Southern Ry. Co.*, 125 Va. 511, 99 S. E. 665, and cases there cited.

There is no question here of imputing negligence to the infant plaintiff nor as to contributory negligence committed by her. There can be no such thing.

Counsel for plaintiff state in their brief that this case is controlled by the cases of *Morgan's Adm'r* v. *Atlantic C. L. R. Co.*, 136 Va. 394, 118 S. E. 233, and *Virginian Ry. Co.* v. *Haley, supra.* The facts in each of those cases clearly distinguish them from the case in judgment.

In the former case the accident hapened when the young woman, who was killed, was riding in a truck on her way to school, presumably in the forenoon. There were four occupants of the truck, all of whom looked both east and west when in about twenty feet of the railroad and none of them saw or heard a train from either direction. After the impact the train ran about twenty rail lengths before the engineer could stop it, a distance of some 660 feet. The ordinance of the city of Petersburg prohibited an engine from being propelled along its street at a greater rate of speed than six miles an hour. The defendant admitted that the speed of its train was from eighteen to twenty miles an hour. As to other material facts of alleged negligence there was a very sharp and real conflict in the testimony and this court held that the evidence in that case presented an issue for the jury.

In the *Haley Case* the accident occurred about noon. The

driver of the automobile, which was struck at a village crossing, testified positively of his repeated looking and listening, in the direction from which the train was coming, at times when such conduct would ordinarily have been effective. The evidence tended to prove that the vision of the occupants of the automobile was obscured by coal cars standing on the side-track of the defendant. This court held that the evidence in that case presented a proper case for the submission of the question of negligence in the particulars to which the evidence applied to the jury. The evidence of the defendant's negligence in that case was quite different from that here. It was of probative force. It is also of moment to note that the verdict in the *Haley Case* was approved by the trial court.

The general principles enunciated in the case are apposite authority for the defendant in our case.

We have mentioned the fact that in the two cases referred to the accidents happened in the daytime. As has been said the accident in the immediate case occurred about 4:30 in the morning when it was dark but clear. It is not disputed that the headlight of the engine was burning brightly. Its beams or rays of light were projected ahead and in front of it at such a distance that when the engine was at a point 900 feet south of the crossing the crossing would be illuminated and the nearer the approach of the train the brighter would be the illumination.

We are in accord with the judgment of the trial court, which we affirm.

*Affirmed.*