Richmond

SOUTHERN RAILWAY COMPANY v. RUTH ANNE BARDEN.

June 16, 1958.

Record No. 4786.

Present, All the Justices.

The opinion states the case.

*H. Merrill Pasco* and *Lewis F. Powell, Jr.* (*Thomas B. Gay; Hun-*

*ton, Williams, Gay, Moore & Powell,* on brief), for the plaintiff in error.

*Harry P. Anderson, Jr. (David E. Satterfield, III; Satterfield, Anderson & Blanton,* on brief), for the defendant in error.

HUDGINS, C. J., delivered the opinion of the court.

This writ of error brings under review a judgment for $7,000.00, entered on the verdict of the jury in favor of Ruth Anne Barden against the Southern Railway Company, in an action for personal injuries she sustained while a passenger in an automobile operated by her husband when it collided with a freight train at a public highway crossing in Henrico county, Virginia.

The decisive question presented is whether the evidence for Ruth Anne Barden, hereinafter designated plaintiff, is sufficient to sustain the verdict of the jury finding that the Southern Railway Company, hereinafter designated defendant, failed to give the crossing signals required by Code, § 56-414.

The collision occurred at about 5:30 p. m. March 28, 1955, at a place referred to in the record as the "Brittles Lane" grade crossing just east of Richmond on defendant's main line between West Point and Richmond. At this location the railroad track extends approximately northeast and southwest, and Brittles Lane, the public highway, extends approximately east and west. The track and the highway intersect at approximately a 45 degree angle. There is a railroad crossing sign, referred to in the record as a "cross-buck" sign, located on defendant's right of way 67 feet west of the nearest rail measured along the center of the highway, and 50 feet measured along the south side of the highway.

Plaintiff was riding on the front seat of the automobile operated by her husband, traveling east, slightly upgrade, along Brittles Lane at 30 to 35 miles per hour when it skidded 51 feet and stopped on the track where it was struck by defendant's locomotive, which was traveling 30 to 35 miles per hour in a southwesterly direction from West Point to Richmond.

In our view of the case, the negligence of plaintiff, if any, need not be discussed, as Code, § 56-416 declares that such negligence is not a bar to the action if the evidence is sufficient to prove that the crossing signals required by Code, § 56-414 were not given.

These Code sections are copied in the margin.*

Plaintiff relies on her own testimony, the testimony of her husband and that of Patrick E. Flood to prove that the statutory signals were not given.

Plaintiff testified that she had previously passed over the Brittles Lane crossing three or four times; that on this particular occasion it was a "nice day and we were not looking straight down the road, all the way down there;" that she first "realized there was a crossing ahead when I was approximately a hundred feet from the cross bars;" that she then looked to her left and turned around to look to the right when "my husband threw his arm in front of me and yelled 'Look out!' and that is when I turned around and saw the train." She said the window on her side of the car was up, "but I believe my husband's window was half down, almost all the way." When asked whether she heard the train give any signal she said, "No, I did not . . . If it had, I would have heard it." She also said "the train blew a whistle and then hit us."

Edward C. Barden, Jr., plaintiff's husband, testified that he knew the crossing was there as he had been over it several times, but this time he was not thinking of it and did not see the crossing until he was about 100 feet from the crossing sign; that he took his foot off the accelerator, reduced his speed to 20 miles per hour, and "looked to my left and to my right, and I asked my wife if it was all right on the right." He said the next thing that happened, he "looked up and saw the train," which sounded its horn "just before it hit me." On

*Code § 56-414, in effect at the time of the collision and prior to the 1956 amendment, provides: "*Bell and whistle or horn; when sounded.*—Every railroad company shall provide each locomotive engine passing upon its road with a bell of ordinary size and whistle or horn, and such whistle or horn shall be sharply sounded outside of incorporated cities and towns at least twice at a distance of not less than three hundred yards nor more than six hundred yards from the place where the railroad crosses upon the same level any highway or crossing, and such bell shall be rung or whistle or horn sounded continuously or alternately until the engine has reached such highway crossing, and shall give such signals in cities and towns as the legislative authorities thereof require."

Code, § 56-416 provides: "*Effect of failure to give statutory* signals.—If the employees in charge of any railroad engine or train fail to give the signals required by law on approaching a grade crossing of a public highway, the fact that a traveler on such highway failed to exercise due care in approaching such crossing shall not bar recovery for an injury to or death of such traveler, nor for an injury to or the destruction of property in his charge, where such injury, death, or destruction results from a collision on such crossing between such engine or train and such traveler or the property in his charge, respectively, but the failure of the traveler to exercise such care, may be considered in mitigation of damages."

direct examination he was asked: "Up to the time you saw the cross-buck sign, had you heard the train sound any horn or ring any bell?" He answered, "No, sir."

Patrick E. Flood testified that at the time of the collision he was collecting insurance from a family who lived in the vicinity at the top of the hill near the crossing, just how far away is not stated; that after making the collection he was sitting in his car with the windows down, making an entry of the amount collected and paying no particular attention to the passing train when he heard simultaneously "the blowing and the rending of metal and a crash or crunch." He was asked whether he "heard any train horn sound prior to the time you heard the horn and the metal together," and answered, "No, sir." He did not go to the scene of the collision and learned the next day that the driver of the car was employed by his insurance company.

Seven witnesses gave positive testimony that the statutory signals were given, three were members of the train crew and four were in the vicinity and unconnected with either litigant. Their testimony may be summarized as follows:

W. E. Arrington, the engineer, testified that when the engine was about 400 yards from the crossing he sounded his horn by giving two longs, a short and a long which lasted up to the crossing. He also said he turned on the electric bell and that as he approached the crossing the horn was blowing, the bell ringing and the headlight burning. The latter was not necessary but was usually done on this run. When the train was about 90 feet from the crossing, he saw the car in which plaintiff was riding. He applied the emergency brakes, struck the automobile, and stopped eight car lengths beyond the crossing.

T. J. Johnson, the fireman, testified that he was sitting on the left side of the engine and that he saw the engineer give the signals, heard them sounding continuously until after the collision. He said the engineer hollered, " 'Look out for the automobile,' " but he was unable to see the automobile from his position.

Robert M. Trull, the head brakeman, testified that he was riding behind the fireman on the left side of the engine and was not in a position to see the automobile at the moment of impact, but he said he heard the horn blowing and the bell ringing in the same manner testified to by the engineer and the fireman.

Charles W. Lipscomb, who was visiting his aunt who lived within

a hundred yards of the crossing, testified that he was walking up on her front porch with his two year old son in his arms when he "heard the train blow, and I had the youngster up in my arms, like I said, and I stopped and turned around and said, 'Here comes the choo-choo train. Watch it,' and as I was standing there the train was coming up to this crossing, and I told my aunt, 'Good Lord! Look at that car!' And they both got to the intersection at the same time and that is when the train hit the car." When asked how long the "train" blew, this witness said, "It blowed from about where that curve was, all the way practically to the intersection. It blowed a long time."

Mrs. Richard Cecil, aunt of witness Lipscomb, testified that she was standing on her front porch and heard the "train" blow one time before she "noticed the car was going by and I noticed he was not slowing up at the time, so I thought there was going to be an accident and as the car neared the railroad crossing I turned my head." She also said the train blew its whistle two or three times altogether.

Richard Cecil testified that he was drawing water from a well located about 330 feet from the crossing; that he saw the car go by, but did not see the train and that he heard the whistle blowing "all the way up for about a quarter of a mile."

George H. Samuels, who lives approximately 360 feet from the crossing, testified that his five year old son was playing across the tracks at the Cecil home; that he heard the "train" blow when he was seated in his living room; that he got up and went to the window facing the crossing to see about his child, saw the train and heard it blowing "off and on" for about a minute before the collision. He also said, "It blew all the way up to the road." He saw the automobile approaching the crossing and realized there was going to be an accident, but did not actually see the collision because the engine cut off his view at the moment of impact.

Where there is a substantial conflict in evidence, it is the exclusive province of the jury to determine the weight and credit to be given the testimony of witnesses. When, however, there is no material conflict in the evidence and the jury's finding is a plain and palpable deviation from the truth, it is the duty of the court to intervene. There is no substantial conflict in the evidence in this case. The pertinent testimony for plaintiff, heretofore stated, is negative while that of defendant is affirmative and positive.

We have repeatedly held that the positive testimony of a

credible witness, who testifies that he saw or heard a particular thing at a particular time, ordinarily outweighs that of a number of other witnesses, equally credible, who, with the same opportunities, testify merely that they did not see or hear it. And where it appears that a positive witness is guilty of perjury unless his statement is true, while a negative witness may be honestly mistaken, the issue should be found in favor of the former if the witnesses are of equal credibility. *Norfolk, etc. R.R. Co.* v. *Mueller Co.*, 197 Va. 533, 90 S. E. 2d 135; *Butler* v. *Darden,* 189 Va. 459, 53 S. E. 2d 146; *Norfolk & Western Ry. Co.* v. *Epling,* 189 Va. 551, 53 S. E. 2d 817; *C. & O. Ry. Co.* v. *Jacobs,* 166 Va. 11, 183 S. E. 221; *Johnson* v. *R., F. & P. R. Co.* 160 Va. 766, 169 S. E. 603; *Southern Ry. Co.* v. *Whetzel,* 159 Va. 796, 167 S. E. 427; *White* v. *Southern Ry. Co.*, 151 Va. 302, 144 S. E. 424; *Southern Ry. Co.* v. *Bryant's Adm'r,* 95 Va. 212, 28 S. E. 183.

This principle is well stated in 20 Am. Jur., Evidence, § 1187, p. 1039, as follows:

"Negative testimony rises or declines in the scale of probative weight according to the opportunity of the witnesses giving it to hear and observe. It is generally recognized that notwithstanding one witness testifies that a fact occurred, weight must be accorded to the unequivocal testimony of another witness, having the same or better means of knowledge, that it did not occur. When, however, a credible witness with apparently adequate opportunity for observation testifies to an occurrence, the mere testimony of other witnesses that they were not cognizant of the occurrence, where the opportunities of the latter for observation are not stated, or where it affirmatively appears that their situation was such or their attention was so engrossed that they probably would not have observed the event if it had occurred, or where their opportunities were not coextensive with those of the witness who testifies postively to the occurrence, is entitled to no weight and is not sufficient to create a conflict in the testimony."

■ Six of the seven witnesses who testified postively that the statutory signals were given, had their attention drawn directly to the train as it approached the crossing and were in positions to hear and observe whether the signals were given. The three members of the train crew were in the cab of the engine and testified that they knew the signals were given. The fireman, not only heard the signals, but saw the engineer blow the horn and ring the bell.

Three of the disinterested witnesses were not only looking at the train as it approached the crossing, but had unusual and cogent reasons for looking and listening. Witness Lipscomb was on a porch nearby pointing out the train to his two year old son, and at that time, his aunt, Mrs. Cecil, was on the porch also looking at the train and the car. The third witness, Samuels, upon hearing the train blow, went to the window of his home to look out for the safety of his child, who he knew was playing across the track and then saw the train approach the crossing, blowing its horn. It is difficult to conceive of incidents more calculated to direct the attention of witnesses to an approaching train and to cause them to hear and observe whether the statutory signals were, or were not, given.

On the other hand, the three witnesses who testified that they did not hear the statutory signals did not have their attention drawn to the train until it was too late, or were not in a position to effectively hear and observe whether the signals were given. This is especially true when the testimony of these witnesses is considered with the strong positive testimony that the signals were given. The fact that some of the witnesses testified that they heard the signals and others testified that they did not hear them, does not of itself present a conflict in the evidence. The only reasonable conclusion to be drawn from the evidence is that the signals were given as required by Code, § 56-414, and that plaintiff, her husband and witness Flood did not in fact hear them.

Plaintiff, in her brief, assigns cross-error to the action of the court in amending Instructions numbered 2 and 9, as offered by her. Neither the instructions offered, nor plaintiff's objection to the amendments were designated to be printed. In addition, the judge in amending the instructions so completely obliterated the parts deleted that it is impossible to ascertain just what language the plaintiff asked the court to include in the instructions. While plaintiff printed in the appendix to her brief what is purported to be the full instructions as tendered, such instructions are not included in the record certified by the trial judge. She wholly failed to comply with Rule 5:1, § 6, (d) and (f). Therefore, the issue sought to be presented by the assignment of cross-error cannot be considered by this Court.

For the reasons stated, the judgment is reversed, the verdict set aside and final judgment entered for defendant.

*Reversed and final judgment.*