# Richmond

## Keith B. Skinner v. Norfolk and Western Railway Company, Et Al.

November 29, 1965.

Record No. 5999.

Present, All the Justices.

*Stanley E. Sacks* (*Sacks, Sacks & Kendall,* on brief), for the plaintiff in error.

*Thomas R. McNamara* and *Kenneth H. Lambert, Jr.* (*Williams, Cocke, Worrell & Kelly,* on brief), for the defendants in error.

SPRATLEY, J., delivered the opinion of the court.

Keith B. Skinner, sometimes hereinafter called the plaintiff, instituted this action against the Norfolk and Western Railway Company and its engineer-employee, L. O. Tucker, seeking to recover damages for personal injuries sustained by him when a truck operated by the plaintiff was struck by a train of the defendant company, operated by L. O. Tucker.

Plaintiff, in his motion for judgment, alleged negligence on the part of the defendants in the maintenance, operation and control of the train and the failure to adequately warn him of its approach. Defendants denied any negligence or omission of duty on their part, and charged that negligence of the plaintiff was the sole, proximate cause of his injuries.

The jury, after having heard the evidence, the instructions of the court, and the argument of counsel, returned a verdict in favor of both defendants. Judgment was accordingly entered thereon, and we granted this writ of error.

As we see it, the decisive question is whether the plaintiff was guilty of negligence, which constituted the sole, proximate cause of his injuries.

The accident occurred in daylight, about 4:30 p.m., on October 3, 1962, at a public highway crossing over the tracks of the Norfolk and Western Railway Company, in the county of Norfolk, now the city of Chesapeake. The crossing is in an open, rural community. In addition to oral evidence, maps and photographs were introduced showing the approaches to the crossing, the crossing itself, and the warning signal devices at the crossing.

The crossing is formed by the intersection of Route No. 648, called the Shell Road, hard surfaced and 18 feet wide, and the double-track railroad of the defendant company. These main line tracks run in an east-west direction: one for eastbound traffic and the other for westbound. Shell Road runs generally northeasterly and southwesterly, and consequently crosses the track at an angle. The two main line tracks, each 4.7 feet wide, cross Shell Road at grade. There is a distance of 8.32 feet between the north rail of the eastbound track and the south rail of the westbound track. At a point approximately

25 feet east of Shell Road, on the south side of the right of way of the railroad, there is located a switch for a spur track which runs off the eastbound track in a southeast direction to the plant of the Virginia Electric and Power Company, hereinafter referred to as VEPCO.

The railroad company maintains signals on each side of the crossing. On the south side they consist of the following devices: standard "crossbuck" with the inscription "Railroad Crossing;" a reflector sign reading "2 Tracks;" a set of automatic flashing red lights with lens approximately 8¾ inches in diameter; a reflector sign reading "Stop on Red Signal," all mounted on a steel pipe 4 inches in diameter, and on the top of which is a bell or gong which sounds when the flashing lights are in operation.

The warning devices on the south side are located 28 feet from the center line of the westbound track, and similar devices on the north side of the track are 14.9 feet from the same point. The flashers, and bells or gongs, are automatically operated by electric circuits along the tracks. On the main line they are activated about 1,000 yards from the crossing by approaching trains. They are deactivated when the last car of a train on the main line has passed a point 411.8 feet beyond the crossing. A train on the spur track, approaching the main line tracks and the crossing, activates the signals when it passes at a point 179 feet from the center line of the crossing, and deactivates them when its end passes a point 51.8 feet beyond the crossing.

Skinner, an employee of Norfolk Welding and Supply Company, driving a truck of his company, and returning to Norfolk from a delivery he had made to the VEPCO plant, approached the crossing from the south on Shell Road. A switching operation was in progress on the tracks. A Diesel engine, traveling about 4 miles an hour, pushing 12 or 14 cars on the eastbound track towards the spur track leading to the VEPCO plant, blocked the highway for traffic. The automatic red flashers and bells at the crossing were in full operation. Skinner stopped his truck facing the tracks. As the end of the last unit of the switching train cleared the crossing, he immediately started forward, slowly and steadily, notwithstanding the continued operation of the visible and audible signal devices. He passed over the eastbound track, and as he drove onto the westbound track, his truck was struck at the right front of its cab by train No. 99 proceeding westwardly on the westbound track. Train No. 99 was a

freight train with 3 Diesel units and 88 cars. It was running at 35 to 38 miles per hour. Skinner was thrown from his truck, and seriously and permanently injured.

Skinner was operating a new truck of the "cab over engine" type in which the operator sits at the very front of the truck. Train No. 99 was operated on a daily run, and usually reached this crossing about 4:30 p.m. each day. The switching procedure, heretofore mentioned, had been a daily procedure at the location involved for five or six years.

The evidence shows that once the automatic signals have been activated by reason of the approach and presence of a train on one of the tracks, the approach and movement of a train on another of the tracks, will not cause any change in their operations. On the other hand, the approach of a second train prevents the automatic signals from ceasing to operate when the first train leaves its circuit.

L. O. Tucker, engineer of train No. 99, testified that he gave the statutory signals required by Code § 56-414 in the proper manner, at the proper time, and at the proper place. The fireman of that train testified also that the required signals had been duly given.

Immediately before the accident, Robert Rose, driving a passenger bus with four passengers, stopped on the north side of the crossing, which was blocked by the movement of the switching train. He saw the headlight of No. 99 approaching and heard its horn sound one time; but was not positive where the engine was when it sounded the blast he heard. He saw the flashing lights and heard the signal bell at the crossing. It was raining hard on the metal roof of the bus; the wind was blowing; and his attention was alternately directed to train No. 99 and to the switching train.

Bertha L. Meeks, a passenger on the same bus, heard the whistle of 99 blow when the train "was way off," and did not hear it blow any more. The blast she heard was "real long." The windows of the bus were closed, and she did not hear any bells at the crossing or any noise from the train engaged in the switching movement.

Mary E. Roberts, another passenger, said she heard train No. 99 blow once about 3,900 feet from the crossing; heard the impact of the collision; heard the train blow again; and saw nothing else.

Thomas Copeland, another passenger, said he heard No. 99 as it approached, saying, "Well, it blowed like most trains do." He heard it blow once; but did not know where it was when it blew. He

further said that he "couldn't hear no bells because it was raining and the wind—it was a storm."

Vallie Hight, another passenger, said she never heard any whistle until the moment of the collision, and that she could barely hear the squeaking of the brakes on the switching train.

None of the passengers in the bus heard the crossing bell or gong sounded. Several other witnesses, including local residents and railway company employees, testified that, under the conditions and circumstances surrounding them at and immediately before the collision, they either heard the whitle of train No. 99 only once, or did not hear it at all. These witnesses explained that they were engaged in pursuing their particular duties.

The plaintiff, Skinner, did not testify.

Plaintiff, relying upon § 56-414, Code of Virginia, 1950 [1959 Repl. Vol.] contends that even though he was guilty of negligence, yet under the saving provisions of § 56-416, he is not barred from recovery, if defendants failed to give the statutory warning thereby required.

Notwithstanding the provisions of the above two statutes, it is still necessary for the plaintiff to prove that a defendant's negligence caused his injuries, that but for it the injuries would not have occurred; but having shown that, he is not precluded from recovery by the fact that he was himself negligent. *Gregory* v. *Seaboard Air Line Ry. Co.*, 142 Va. 750, 755, 128 S. E. 272; *Etheridge* v. *Norfolk So. Ry. Co.*, 143 Va. 789, 798, 129 S. E. 680; *C. & O. Ry. Co.* v. *Barlow*, 155 Va. 863, 872, 156 S. E. 397; *Railway Co.* v. *Haley*, 156 Va. 350, 378, 157 S. E. 776; *Johnson* v. *R., F. & P. Ry. Co.*, 160 Va. 766, 780, 169 S. E. 603; and *So. Ry. Co.* v. *Giles*, 169 Va. 218, 222, 192 S. E. 772.

As Justice Holt said in *Etheridge* v. *Norfolk, So. R. Co., supra,* 143 Va., pages 798, 799:

"(I)t is immemorially true that no judgment can be based upon a defendant's negligence unless that negligence in some degree contributed to the injury. There must be some casual (sic) connection between them. Certainly one, who with suicidal intent threw himself in front of an approaching train at a crossing, could not be heard to say that the whistle was not sounded, and so it does not follow that the violation of the statute [§ 3959 Code 1919, now § 56-416, Code 1950] 'in any particular,' necessarily gives to a plain-

tiff the right to recover. Its purpose was not to impose an unconditional penalty on railroads, but to protect the public."

In *Railway Company* v. *Haley, supra,* 156 Va., page 379, involving an accident at a public highway crossing over railroad tracks, we said:

"The establishment of a causal connection between the failure to give the signals and the injury is as essential an element, and as much a part of the plaintiff's case as the establishment of the fact that the defendant failed to give the statutory signals, or that he was injured. All three elements must be established by the evidence. A causal connection between the failure to give the signals and the injury will no more be presumed than that the defendant failed to give the signals or that the plaintiff was injured. Proof of the failure to give the prescribed signals and proof of injury and nothing more are not of themselves sufficient to support a recovery."

Cited in approval were the following cases: *Norfolk So. R. Co.* v. *Banks,* 141 Va. 715, 126 S. E. 662; *Etheridge* v. *Norfolk So. R. Co., supra,* 143 Va., and *Norfolk & W. R. Co.* v. *Wellons' Adm'r,* 155 Va. 218, 154 S. E. 575.

In *Southern Ry Co.* v. *Campbell,* 172 Va. 311, 317, 1 S. E. 2d 255, we approved the following rule:

"At grade crossings of railroads the rights of a traveler on the highway and of the railroad company are 'mutual, reciprocal and co-extensive,' but generally a moving train is accorded the right of way. A traveler approaching such crossing for the purpose of crossing must always exercise care proportioned to the known danger, and this care must be such as one who knows the danger and of the prior right of passage would be expected to exercise. The duty of looking and listening for approaching trains must be discharged in such manner as will make the looking and listening effective. The greater the danger, the greater the measure of duty. The track itself is a proclamation of danger, and the traveler has no right to proceed across the track without such looking and listening for approaching trains, * * *." *Southern Ry. Co.* v. *Wilson,* 196 Va. 883, 887, 86 S. E. 2d 53; *Norfolk & Western Ry. Co.* v. *Hagy,* 201 Va. 183, 110 S. E. 2d 177; *Bangley* v. *Virginian Ry. Co.,* 195 Va. 340, 348, 78 S. E. 2d 696; *Pennsylvania R. Co.* v. *Rusynik,* 117 Ohio St. 530, 159 N. E. 826, 56 A. L. R. 538.

There was positive and affirmative evidence that train No. 99 gave the proper statutory signals, and there was no positive con-

tradiction of that fact. It is true other witnesses said that they did not hear such signals; but it is also true that their opportunity to hear was limited, and their attention was directed either to their own duties, or diverted by the fast developing tragedy immediately in front of them. It is significant that none of the passengers on the bus heard the bell or gong at the crossing. No one testified that the warnings which were sounded by train No. 99 were insufficient warnings of its approach, or that the warnings of the crossing bell were insufficient. Plaintiff had no more right to have a jury speculate upon the insufficiency of the warnings given, in the absence of evidence of their inadequacy, than the right to disregard the positive evidence that the statutory warnings were given. *A. C. L. R. Co.* v. *Clements,* 184 Va. 656, 666, 36 S. E. 2d 553; *Bangley* v. *Virginian Ry. Co., supra,* 195 Va., page 349; *So. Ry. Co.* v. *Barden,* 200 Va. 98, 103, 104 S. E. 2d 13; *Norfolk & Western Ry. Co.* v. *Sykes,* 200 Va. 541, 550, 106 S. E. 2d 734.

Here, Skinner stopped his truck in a place of safety to await the passage of a train across the highway in front of him. In addition, visible and audible signals warned him not to cross the tracks until they were clear. Nevertheless, before the passing train had gone far enough to clear his view to his right, and while the red lights were flashing and the warning bell or gong was sounding, he slowly drove, approximately 25 or more feet, across the eastbound track, and thence eight and a fraction feet between that track and the westbound track, onto the latter track directly into the path of an approaching train.

It is true that Skinner's view was temporarily obstructed by the movement of the train traveling toward the spur track; but this obstruction would have been removed in a few seconds had he but waited that short length of time. Moreover, as he slowly crossed the eastbound main line tracks, seated in his high cab, driving in a slanting direction northeasterly, he reached a point where he could have had a view of the train approaching from his right had he looked in that direction. Yet, he did nothing tending to show that he was taking any care or caution for his own safety, either by attempting to stop, or stopping his truck, or by turning it to one side.

It seems clear and conclusive that Skinner blindly disregarded his duty to exercise ordinary care, or to observe the signal devices warning him not to cross the tracks. Notwithstanding the imperative warning of the signals, and without any reasonable excuse, he placed

himself in a position of danger, from which there was no escape. There was no justification for his attempt to cross the railway tracks under the circumstances existing. There was nothing to throw him off guard, save his negligent and blind inattention to his surroundings and the warning devices. His conduct amounted to an utter abandonment of care and caution. He might as well have intentionally driven his truck in front of the approaching train. His negligence was such as to constitute the sole, proximate cause of his injuries.

Having reached the above conclusion, we do not deem it necessary to consider plaintiff's further assignments of error, or defendants' assignments of cross-error, which relate principally to instructions given or refused. As we see it, the jury could not have properly found any verdict other than for the defendants.

In order, however, to avoid confusion in the future, we desire to emphasize the point that we do not wish to be understood as approving or disapproving any of the instructions offered, given, or refused by the trial court, to which exceptions were taken.

For the foregoing reasons, the judgment complained of is affirmed.

*Affirmed.*