## Richmond

EDITH DOZIER BUNN, EXECUTRIX, ETC. v. NORFOLK, FRANKLIN AND
DANVILLE RAILWAY COMPANY, INCORPORATED.

June 11, 1976.

Record No. 750872.

Present, All the Justices.

*Raymond H. Strople (Dennis F. McMurran; Bernard Miller; Moody, McMurran & Miller, on briefs), for plaintiff in error.*

*Gerard P. Rowe (Edward L. Oast, Jr.; Williams, Worrell, Kelly & Greer, on brief), for defendant in error.*

HARRISON, J., delivered the opinion of the court.

Edith Dozier Bunn, Executrix of the estate of her husband, James A. Bunn, sought to recover damages from the Norfolk, Franklin and Danville Railway Company, Incorporated, for the decedent's alleged wrongful death. The railway denied any negligence on its part, contending that the sole cause of Bunn's death was his own negligence. Following a five-day jury trial, a verdict was returned for the railway, and the court entered final judgment thereon.

This case grew out of a collision between a 1973 model Ford LTD automobile operated by Bunn and a N. F. & D. train. The accident occurred on December 22, 1972, at 7:30 p. m. in Portsmouth, at a point where the railway's track crosses West Norfolk Road. The track of the railway runs generally northeast to southwest. For clarity, a sketch is attached to this opinion.

The train, en route to Suffolk from the Virginia Chemicals Plant in Portsmouth, had traveled in a general westerly direction a distance of approximately 1.8 miles before reaching the crossing. Bunn was on West Norfolk Road en route to the Norfolk Regional Airport and was proceeding in a general easterly direction. He was accompanied by his grandson, Gregory V. Hill, Jr., age 15.

The night was very dark, and the road was described by a witness as damp, but "not soaking wet". Numerous photographs clearly depict the crossing and its approaches. West Norfolk Road is a 2-lane, hard-surfaced road, 19.4 feet wide, with its lanes delineated by a yellow center line, and bordered on the edges by white lines. The

speed limit on this road is 35 mph. At a point 300 feet west of the crossing in the lane of the road in which Bunn was traveling, is painted, with white reflectorized paint, a large cross and the capital letters RR. At the crossing, and on or near the south shoulder of the highway, is a "crossbuck" or "buckboard" sign, reading "Railroad Crossing". For some distance before the crossing is reached the railroad and West Norfolk Road run roughly parallel. About 150 feet east of the crossing the railroad curves to the southwest and crosses the highway at an angle.

The railroad's right-of-way is cleared of trees and bushes on both sides. Between the railroad and a line of woods on the north side is located a utility line which parallels the railroad. The right-of-way of the utility line is also cleared of trees and bushes. Photographs show that there are trees along the north side of West Norfolk Road until the rights-of-way of the utility line and the railroad are reached. The rights-of-way run through a wooded area and are, in effect, an opening between trees. The rights-of-way and the railroad track are barely discernible to a motorist driving east on the road at a point 300 feet west of the crossing. However, beginning immediately thereafter, the rights-of-way and railroad become increasingly obvious to such motorist, and are clearly visible from 150 to 200 feet of the crossing.

The train consisted of a diesel engine pulling thirteen cars and a caboose. Its engine was equipped with a vertical double sealed beam headlight of 720,000 candlepower, described as "a combination flood and spot light", and two ground lights. A reflectorized white strip was painted around the engine. Immediately prior to the accident two automobiles headed west on West Norfolk Road had stopped on the east side of the crossing to permit the passage of the train. The headlights on both cars were burning, as were the lights on the engine of the train.

The appellant's principal witness was Gregory V. Hill, Jr. This witness testified that he and the decedent passed the 7-Eleven Store and the Texaco Service Station located to their left and shown on the sketch; that as they passed the station he recognized a friend there and turned in his seat to look; that when he turned back he saw a light which he knew "had to be a train light"; and that he told his grandfather, and the decedent then put on brakes. He estimated the decedent's speed at 20 mph as he rounded the curve located just beyond the service station, but stated that when he turned back from observing his friend, "Granddad was going 25 mph. Right here I

noticed the train light". He estimated they were 150 feet from the railroad crossing when he observed the train's light, and about 90 feet when he yelled to his grandfather.

Hill testified that the train's bell was not rung and that its horn or whistle was not blown. He said he was in a position that if the bell was ringing and the whistle was blowing, he would have heard them. He admitted the windows to the car were closed. While Hill testified that the brakes did not stop the automobile, he also said that when his grandfather put on brakes, "it slowed the car down and I kept going, and I put my hands up on the dashboard, and we slid or we collided with the train at the tracks". The front of the automobile hit the right front of the train engine, doing great damage to both and killing plaintiff's decedent. Hill admitted on cross-examination that he "never actually saw the train until we had collided with it. I saw the train light . . . which I knew was the train".

Keith Gordon Regelin was driving west on West Norfolk Road and stopped at the crossing because of the approaching train. He said that as he neared the crossing he heard the train horn blow and noted a continuous blowing on up to the crossing. One car ahead of him had also stopped and was awaiting the passage of the train. He observed the lights of the Bunn car as it approached the crossing at a speed of "maybe twenty-five, thirty-five miles an hour". The N. F. & D. train was to Regelin's right, "just coming into the crossing". Regelin said that he realized then that there was going to be an accident because Bunn "was coming, well, I wouldn't say fast, but he was not lessening his speed any like he was going to stop". The witness said that he saw the lights of the car up until the time of impact, and that "At the last minute, just before impact the car lights appeared like he slammed on the brakes. They dipped slightly, and then everything went black". Regelin said that the Bunn automobile at that point was just about at the crossing and that the train was crossing the highway. When asked if the bell was ringing he replied: "I couldn't hear the bell. I assume it was, but I did not hear a bell. I heard a horn."

The only other eyewitness to the accident was Jesse E. Pruden, the brakeman on the train, who was sitting on the right or north side of the engine. Pruden said that the bell had been activated and was ringing and that the train horn had been blown at least 800 feet from the crossing. Pruden testified that he noticed the Bunn car was not slowing up as it approached the crossing; that it apparently did not intend to "respect the crossing"; and that he yelled for the

engineer to "shoot the brakes". He said that the engineer immediately applied the emergency brakes, bringing the train to a stop shortly thereafter, "roughly three or four car lengths", but not in time to avoid the collision.

E. E. Madray, the train's engineer, did not see the accident for he was on the left or south side of the engine, and his view was obscured thereby. He testified that he was operating the train at approximately 15 mph; that he had activated the bell, and it had been sounding "ever since I left West Norfolk, that last crossing"; and that he had sounded the horn between 800 and 1000 feet prior to reaching the crossing. He said that he applied the emergency brakes approximately 50 feet before reaching the crossing and brought the train to a complete stop some 250 feet thereafter.

James R. Powell, the train flagman, was riding in the caboose on the rear of the train. He estimated the speed of the train to have been 15 mph. He did not see the accident but testified that he knew the horn was blowing—he could hear that from the rear of the train, but that he could not hear, "that far away", sufficiently to tell whether the bell was ringing.

Mrs. Myrtle C. Dennis resides at 4707 West Norfolk Road, the second house east of the crossing and on the south side of the road. She testified positively that the train blew for the crossing to such an extent that "we stopped talking because you couldn't understand or hear what the other one was saying. The train did blow".

J. A. Roane was preparing to leave the Dennis home when he "heard the train whistle". He said that he delayed his departure because he did not want to get in a line of traffic which he knew would be occasioned by the train blocking the crossing. He described the whistle as "several blasts".

Carl Dennis resides at 4703 West Norfolk Road, on the east side of the crossing and on the south side of the road. He said that on the night of the accident he heard the rumble of the train and heard the whistle blow, which he described as two longs, a short and then a long. He said that "the sign that causes the train to blow is right in front of my house . . .".

Officer F. J. Erlbeck of the Portsmouth Police Department investigated the accident and testified that the Bunn automobile left skid marks which extended 80 feet 10 inches and "led right to the point of impact". He said that the automobile ran into the side of the train's engine. When asked if the tires got traction sufficient to leave a skid mark on the highway, he answered: "That's correct." This witness

was further asked: "So I take it whatever moisture there was was very light?" and he responded: "Yes. That day it was raining off and on, so it's very possible to get a skid mark."

■ We find no merit in appellant's assignment of error which questions the action of the trial court in instructing the jury that ". . . the ordinances of the City of Portsmouth in effect at the time of this accident impose a maximum speed limit upon trains in that portion of the City lying west of Douglas Avenue at 45 miles per hour." Churchland, the community in which the accident occurred, became a part of Portsmouth by annexation in 1968. The trial court found that the accident occurred in the newly annexed area at a point west of Douglas Avenue, and held correctly that the ordinance applied. Further, it was the duty of the train engineer to approach the crossing at a reasonable speed under the circumstances, and the jury was so instructed at the request of appellant.

■ Neither do we find error in the refusal by the trial court to submit to the jury the question whether the crossing was extra-hazardous. West Norfolk Road is not an arterial highway, is not congested and is not one of the principal streets of Portsmouth. In 1972 the greater percentage of the land around the crossing was wooded, in open fields or in cropland. Officer Erlbeck testified, "That particular area is more or less undeveloped. . .". There are no activities in the immediate vicinity of the crossing that would normally distract the attention of a motorist, and there is no evidence that there was any peculiar or unusual condition surrounding this crossing such as to render it unusually dangerous. As we said in *A. C. L. R. Co.* v. *Clements,* 184 Va. 656, 668, 36 S.E.2d 553, 559 (1946).

> "Ordinary care on the part of a traveller affords both notice and protection. It was just an ordinary crossing. There was no congestion of traffic. There was an adequate view in both directions. There was absolutely no showing of such conditions as are ordinarily held to necessitate a flagman, the maintenance of a gate, or other signal devices."

■ The objection of appellant to the action of the trial court in submitting to the jury the tables of speed and stopping distances was well taken. The experiments made as a basis for the tables found in Code § 46.1-195 were "made with motor vehicles, unloaded except for the driver, equipped with four-wheel brakes, in good condition, on dry, hard, approximately level stretches of highway free from

loose material". The Bunn car was occupied by two persons. While it is generally known that a 1973 Ford LTD automobile is equipped with four-wheel brakes, there was no evidence of the condition of this car's brakes. The road was not dry. While it was hard-surfaced and its approaches to the crossing were level, there was no evidence that it was free from loose material.

Although "these tables create no presumption in law", their presence before the jury injected an element in the case which was not warranted by the evidence. We have repeatedly discouraged the granting of an instruction on the tables of speed and stopping distances unless it is clearly supported by the evidence. *See Terry* v. *Fagan,* 209 Va. 642, 166 S.E.2d 254 (1969); *White* v. *Hunt,* 209 Va. 11, 161 S.E.2d 809 (1968); *Cook* v. *Basnight,* 207 Va. 491, 151 S.E.2d 408 (1966); *Shelton* v. *Mullins,* 207 Va. 17, 147 S.E.2d 754 (1966); *Beasley* v. *Bosschermuller,* 206 Va. 360, 143 S.E.2d 881 (1965).

However, the verdict of the jury will not be set aside, for the evidence clearly exonerates the railroad of any negligence and establishes, with equal clarity, that the negligence of the decedent was the sole cause of the collision.

There is no evidence that the speed of the train had anything to do with the accident. Although its permissible speed was 45 mph, the three witnesses, Madray, Powell and Pruden, who testified regarding speed, estimated it to have been approximately 15 mph. Gregory V. Hill, Jr. simply said: "It [the train] seemed to be going faster than we were."

The crossing was not an extra-hazardous one. The photographs show the right-of-way on both sides of the track to have been cleared. No one has claimed that the train was not properly manned; that it was not in good operating condition; or that its brakes did not function. The brakeman saw the approaching Bunn car, and when he realized that its driver was not lessening his speed and was not going to "respect the crossing", he yelled for the engineer to "shoot the brakes". The engineer immediately applied the emergency brakes, and they were effective. Regelin testified that he heard the air brakes being applied and that the train stopped after the engine and two cars had passed the crossing.

Witnesses Madray and Pruden testified positively that as the train approached the crossing the bell was ringing and the horn was being sounded. Powell and four disinterested witnesses testified unequivocally that they heard the horn of the train blowing. The positive testimony of these seven witnesses was contradicted

only by the negative testimony of decedent's 15-year-old grandson. In *Railway Company* v. *Barden*, 200 Va. 98, 102-03, 104 S.E.2d 13, 16 (1958), we said:

> "We have repeatedly held that the positive testimony of a credible witness, who testifies that he saw or heard a particular thing at a particular time, ordinarily outweighs that of a number of other witnesses, equally credible, who, with the same opportunities, testify merely that they did not see or hear it. . . ."

This rule applies unless, as we said in *National Union Fire Ins.* v. *Bruce*, 208 Va. 595, 598, 159 S.E.2d 815, 818 (1968):

> "[T]here is evidence that the one who denies a fact [1] had good opportunity to see, and [2] it is shown that he probably would have seen the matter if it had occurred, or [3] it is shown that his attention was drawn to the situation where the fact was supposed to have existed, . . ."

The mere fact that Hill said he was in a position to have heard the train signals had they been given is not necessarily sufficient to render his testimony positive in character. The facts could show otherwise. In *Skinner* v. *Railway Company*, 206 Va. 649, 655, 145 S.E.2d 170, 174 (1965), we said:

> "It is true other witnesses said that they did not hear such signals; but it is also true that their opportunity to hear was limited, and their attention was directed either to their own duties, or diverted by the fast developing tragedy immediately in front of them. . . ."

In the instant case Hill was a passenger in an automobile. The engine of the car was running, the car was in motion on a road that was wet, and the windows of the vehicle were closed. His "opportunity to hear was limited". He was twisted around in the car, looking back toward the service station, and his "attention was directed" to a friend whom he recognized. When he turned forward in the car he at once saw the train lights, realized he was faced with an impending accident, and his attention was "diverted by the fast developing tragedy immediately in front of" him. The overwhelming evidence is that the railway company gave proper warnings of its approach to the crossing; that its employees were maintaining a proper lookout; and that the train was proceeding at a reasonable speed.

It is unnecessary for us to cite the numerous cases outlining the duty of a motorist who undertakes to cross a railroad track. In *Southern Ry Co.* v. *Campbell*, 172 Va. 311, 317-18, 1 S.E.2d 255, 257-58 (1939), we approved the following rule:

" 'At grade crossings of railroads the rights of a traveler on the highway and of the railroad company are "mutual, reciprocal and co-extensive," but generally a moving train is accorded the right of way. A traveler approaching such crossing for the purpose of crossing must always exercise care proportioned to the known danger, and this care must be such as one who knows the danger and of the prior right of passage would be expected to exercise. The duty of looking and listening for approaching trains must be discharged in such manner as will make the looking and listening effective. The greater the danger, the greater the measure of duty. The track itself is a proclamation of danger, and the traveler has no right to proceed across the track without such looking and listening for approaching trains, . . .' ".

To the same effect see *Skinner* v. *Railway Company, supra; Railway Company* v. *Hagy,* 201 Va. 183, 110 S.E.2d 177 (1959); *Railway Company* v. *Sykes, Adm'r,* 200 Va. 541, 106 S.E.2d 734 (1959); *Southern Ry. Co.* v. *Wilson,* 196 Va. 883, 86 S.E.2d 53 (1955).

In the instant case Bunn had just traversed one crossing of the N. F. & D. and was approaching a second. Testimony introduced by the appellant convicts the decedent of negligence which was the sole proximate cause of the accident at the second crossing. Hill testified that after his grandfather rounded the curve and was approximately 300 feet from the crossing, he accelerated the speed of his car from 20 to 25 mph. At this point Bunn should have been looking and listening, and preparing to stop if necessary. He was then driving over or very near the large white reflectorized RR warning sign painted on the surface of his lane of the highway, and he was facing the crossbuck sign immediately ahead. Photographs clearly show that from a point more than 150 feet west of the crossing Bunn had an almost unlimited and unimpaired view of the approaching train. Further, the railroad track curves toward the crossing. The photographs, taken four days after the accident, show little foliage on the trees.

The evidence is conclusive that the decedent never saw or did not heed the approaching train until his grandson yelled. The grandson's attention had been directed toward the Texaco Service Station as the

Bunn car approached the crossing. It is significant that *immediately* after Hill turned in the car and looked in the direction of the crossing he saw the headlight of the train which was clearly visible to him. He said he was the first one to see the train and knew there was going to be an accident. He estimated that the car was then 150 feet from the crossing and that his grandfather applied the brakes only after he yelled.

We know that the decedent was aware of the train when he was at least 80 feet 10 inches from the crossing because his vehicle left tire marks on the highway for that distance. The time that elapsed and was lost by his inattention, and by his failure to maintain a proper lookout, was the time it took the grandson to observe the headlights of the approaching train, react to the danger that confronted them and communicate an alarm to the decedent. Additional time must also be added for the decedent to react, apply the brakes and for the brakes to take effect. Had the decedent been keeping a proper lookout he would have seen the approaching train when he was at least 150 feet from the crossing and would have had ample time and distance in which to stop. It is inescapable that the decedent was completely oblivious of the train and the crossing until he was aroused by the warning of his grandson.

Witnesses Regelin and Pruden observed the car as it approached the crossing and each man, independently of the other, concluded from the manner in which it was being operated that Bunn was not going to stop for the crossing and that there was going to be an accident.

Had Bunn exercised ordinary care and caution at a time when looking and listening would have been effective, he would have seen the headlight of the approaching train and would have heard the signals it gave. Seven persons in the immediate vicinity of the crossing did hear the signals. The warnings given by the railway, the signs painted in the road, the crossbuck sign, the white stopping line, and the powerful headlight on the engine, all went unheeded by the decedent.

It is also significant that Regelin and the operator of another automobile, both approaching the crossing from the east, stopped and yielded the right-of-way to the train. The drivers of these vehicles were not in as good a position to observe the lights of the train as was plaintiff's decedent, for the train was approaching the Bunn vehicle and its lights necessarily flooded the crossing area in front of Bunn.

The record offers no explanation for the inattentiveness of Bunn. He was not a stranger to the area in which the accident occurred. His daughter, whose home he had just left, resided at 5208 West Norfolk Road, and the crossing involved is located not very far distant on the same road. The grandson testified that the decedent was familiar with the road and knew the way to the airport. An exhaustive examination of the evidence discloses no explanation for this tragic accident other than a failure by plaintiff's decedent to exercise the due and ordinary care required of a normal person under the circumstances which existed the night of the accident.

For the reasons stated, the trial court erred in refusing to sustain appellee's motion to strike the evidence. However, because the conclusion we reach is consistent with the verdict of the jury and the final judgment of the trial court, we affirm that judgment.

*Affirmed.*

COMPTON, J., dissenting.

There was credible positive evidence from the decedent's grandson that the train horn was not sounded and that the bell was not rung, *Poole* v. *Hassell*, 206 Va. 97, 101, 141 S.E.2d 707, 710 (1965); *Chesapeake & Ohio Ry.* v. *Jacobs*, 166 Va. 11, 17-18, 183 S.E. 221, 224 (1936), yet the majority decides as matters of law the issues of negligence and proximate cause. I disagree. In my opinion, these questions were pure matters of fact proper for jury determination. Therefore, and because the trial court committed prejudicial error by allowing the jury to consider the tables of speed and stopping distances, I would reverse this case and remand it for a new trial on all issues.

Sketch on following page.